[L. A. No. 14966. In Bank.—March 26, 1935.]

BEULAH J. ABRAHAM, Appellant, v. VIRGIL J. SIMS et al., Respondents.

W. E. Abraham and H. B. Stewart for Appellant.

Elmer W. Heald, District Attorney, and S. L. McCrory, Assistant District Attorney, for Respondents.

THE COURT.—After further consideration of the questions involved in this proceeding, we are of the opinion

that the decision rendered by the District Court of Appeal correctly determines the matters at issue therein. We therefore adopt the opinion of that court written by·Mr. Justice *pro tempore* Haines as the opinion of this court. It is as follows:

"This is a *mandamus* proceeding instituted by Beulah J. Abraham, as petitioner, to require the respondents Virgil J. Sims, A. M. Whipple and W. W. Goodson, as members of and constituting the Board͵ of Trustees of the Brawley School District in Imperial County, California, to reinstate her as a teacher in the Brawley schools; to classify her as a permanent teacher in said district and to issue warrants for her salary as a teacher in said schools for that part of the year 1932 which had elapsed between the opening of said schools on September 19, 1932, and the filing of this petition on November 14, 1932.

"The petition alleges that said Sims, Whipple and Goodson have constituted and do constitute the Board of Trustees of said district, and that one McIntire has been and is the superintendent of schools for said district; that the petitioner was employed as a teacher in the schools of said district for the school years 1927–28, 1928–29, 1929–30, 1930–31, 1931–32, and by reason of having taught therein for a period of three years became entitled to be classified as a permanent teacher under the provisions of section 5.500 of the School Code, and upon her reelection and employment as a teacher in said schools for the year 1930–31 she became such permanent teacher. It is further alleged that on September 16, 1932, she was notified by said McIntire that she had been assigned to teach 4B and 5B grades in one of the schools of said district for the year 1932–33; that on September 19, 1932, the date on which the school year commenced, she presented herself at the school ready and willing to proceed with her duties as such teacher, but that without assigning any reason therefor McIntire refused to allow her to do so; that on the next two days she again presented herself with the same result; that on the last of these days he told her she would no longer be permitted to teach in said schools and that. she need not return, and at that time placed another teacher in charge of the classes to which she had been assigned. It is further alleged that she afterward received from respondents a letter to the effect that .

on September 20, 1932, the board had 'accepted the return of an unsigned contract as her resignation as teacher in said schools'; that it is untrue that she ever refused to sign any contract tendered her by respondents, and it is untrue that she ever tendered any resignation as such teacher; but that on the contrary she has at all times since the beginning of said school year been ready and willing to assume and perform her duties as such teacher and has so notified respondents both verbally and in writing; that she has demanded reinstatement as a teacher and that she be permitted to assume and perform her duties as such 'under the classification to which she was entitled'; but that respondents and their said superintendent made no reply to her communications and have refused to reinstate her; that no charges for her removal as a teacher have been preferred against her and that she is the holder of a life certificate from the state and has all the qualifications required by the School Code to entitle her to classification as a permanent teacher. Respondents, she says, refuse to issue warrants for her salary from the beginning of the school year 1932, and she has no plain, speedy and adequate remedy in the ordinary course of law.

"Respondents answered, admitting many of the allegations of the petition, but claiming that her employment for the year 1930–31 did not include the first month of that year. They admit that at the beginning of the school year 1932–33 she presented herself and offered to assume her duties as alleged, and admit that McIntire refused to allow her to do so, and that they have, for what they describe as the 'current school term', refused to draw any salary warrants in her favor. This refusal they justify by saying that at a meeting on April 18, 1932, they ordered a general reduction of the salaries of all teachers in the elementary schools of the district, that all $1,600 salaries, including petitioner's, were reduced to $1557 'for the next school term' (evidently meaning 'year'), of all of which petitioner was notified in May, 1932; that she was subsequently tendered, by respondents, a contract for teaching at such reduced figure for the school term (year) beginning September 19, 1932, but refused to sign it and has ever since persisted in such refusal, for which reason respondents have

refused to permit her to enter upon the duties of a teacher for that term (year).

"To this answer the petitioner interposed a demurrer, which was overruled. Thereafter the case was tried and judgment rendered in favor of respondents, denying to petitioner the writ sought. Hence this appeal.

"It is petitioner's claim that she never in fact refused to sign the contract tendered her, but, on the contrary, was prevented by respondents and their superintendent from doing so. It is her further claim that, since she had become a permanent teacher, no new contract was necessary to the continuance of her status as such; and, therefore, that in the absence of any evidence that she intended to abandon her position as such teacher, her action in returning unsigned the contract tendered her could not amount to a resignation or justify respondents in treating her position as vacant. Respondents dispute the correctness of both of these contentions, and it will, therefore, be necessary to consider them.

"It appears that for the school year 1931–32, petitioner had been employed at a salary of $1,600, and the respondents, at a regular meeting held on April 18, 1932, voted to fix, for the succeeding school year, the salaries of all teachers then receiving pay at the rate of $1,600 per year, at the lower rate of $1,557 per year. A teachers' meeting attended by petitioner was held on the following day, at which this reduction was explained by McIntire, the superintendent. For some reason, not clearly disclosed by the record, respondents undertook to dispense with petitioner's services for the ensuing school year and she was so notified on May 16. Either just before or just after that time, she raised the question of her classification as a permanent teacher. Respondents took the position that since she had not served during the first month of the school year 1930–31, she was not entitled to be so classified and it was agreed that the question should be submitted to the district attorney. His opinion was that she was entitled to this rating and he submitted the question to the attorney-general, who expressed the same opinion. These rulings were ultimately accepted by respondents, who held a meeting on September 16, 1932, three days before school was to open, and voted to offer petitioner a contract for the school year 1932–33,

at the $1,557 rate. Such a contract was on the same day prepared, executed by the clerk of the district and handed to a Mrs. Burris, who was McIntire's secretary, to take to petitioner, which was done. Petitioner's account of what she said to Mrs. Burris and the latter's account of the interview differ. Mrs. Abraham says that when the contract was handed to her she said: 'I want to see if the salary is what it should be before I sign it,' that she looked at it and said, 'No, the salary is not what it should be.' She says that she spoke of the omission to raise her salary in the preceding year (1931–32), when the salaries of others in her group were raised, though in former years she had participated in such salary increases as they had received. Her point seemed to be that if salaries were now to be reduced, this ought not to apply in her case as she had not, for the last year, received an increase when the rest in her group had. She says that she then asked Mrs. Burris to take the contract back to McIntire 'and show it to him and tell him about the salary', and she added, 'If it is not all right 'phone me and I will come over'; that Mrs. Burris took the contract back, and though she, that is Mrs. Abraham, expected her to return with it, she did not.

"Mrs. Burris testified: 'I handed Mrs. Abraham the contract and before she looked at it she said she didn't believe she was going to sign it, and then she got her glasses—she read it over and she said, ''No, I won't sign that, this is not the right salary. I won't sign that contract,'' and I took it back to Mr. McIntire's office. . . . I told her I would take it back and give it to him. She said, ''I will come over and see him this afternoon. I don't have time right now.'' ' Mrs. Burris went on to say that she did not see Mrs. Abraham further that afternoon (Friday), but that she saw her go into McIntire's office the next morning (Saturday, September 17), between 9 and 10 o'clock, and that on that (Saturday) afternoon Mrs. Abraham had told her that 'she didn't mean to send the contract back, that she just meant to have it come back for consideration of the salary and I told her I brought it back and told Mr. McIntire she would not sign it because the salary was not right'. Asked further about what Mrs. Abraham had said to her the preceding afternoon, Mrs. Burris said: 'She said that she thought she should have had more money the pre-

vious year, her salary was not right, and that she wanted to see if she could not get the difference in the salary she got and what some of the other teachers got, she thought she should have got the same as them that year.' She further testified that Mrs. Abraham never did say that she would work for the salary specified in the contract offered her, but that on Saturday, October 1, 1932, Mrs. Abraham had come. to witness' home and 'said she didn't quite re-- member what was said and wanted to know if I would tell her what she said that day I delivered her the contract, and I told her I went back and told Mr. McIntire she would not sign it. because it was not the right salary', whereupon, 'she told me she had went to Mr. McIntire and he had refused to give her the contract. She asked for it again on Saturday morning, and then we didn't talk about it any more'.

"Mrs. Burris testified further that McIntire had put the contract in the safe on instructions from respondent Sims. Asked whether when she had originally taken the contract to Mrs. Abraham the latter had not asked her to take the contract back to McIntire 'for the purpose of ascertaining whether or not the salary mentioned therein was correct', her answer was 'She just said she wouldn't sign it, that the salary was not right . . . she said something about calling her, but I didn't have time. I thought she would come over.'

"McIntire testified that pursuant to the board's action on September 16, he caused a contract at a salary of $1,557 to be submitted on that day to Mrs. Abraham by his clerk, Mrs. Burris; that she brought it back and after a conversation with respondent Sims, who was in the office, he, McIntire, placed it in the safe; that next morning Mrs. Abraham called between 9 and 10; that he had a private conversation with her in his inner office, at which time 'she told me that she had returned the contract and she was not·willing to sign it because it was not a sufficient salary. I asked her if she had been delivered a contract the previous day, and she said, "Yes." I asked her if she returned it voluntarily, and she said "Yes," and she added she was not willing to sign it because it was not sufficient salary. . . . I told her that I would be glad to submit, that I intended to submit the matter to the Board at the next meeting on September 20, and they would take care of the matter, and if she wished

to be present at that meeting, we would be very glad to have her.' He says that the contract, at the time of the conversation, was in the safe and that Mrs. Abraham neither said that she wanted to sign it nor that she would work for the $1,557. He did say, however, that he told her that the contract had been placed in the safe at the direction of respondent Sims, who was chairman of the board; that he did not then offer it to her to sign and he does not know whether she then wanted to sign it or not. He admits that on the same morning at his own suggestion she attended a teachers' meeting 'at which he introduced her as a teacher of grades 4B and 5B. He admits that on Monday, Tuesday and Wednesday (September 19, 20 and 21) she presented herself for the purpose of teaching and that he refused to permit her to do so. He says that she did not, even up to the time of the trial, express any willingness to teach for the salary offered her.

"All three of the respondents testified at the trial. Sims, the chairman of the board, says that when Mrs. Burris came back from Mrs. Abraham's house on the afternoon of September 16, he happened to be in the office and directed McIntire to put the contract into the safe until the board could act on it. Someone, and Sims believed it was he, suggested that an opinion be gotten from the district attorney about the legal effect of Mrs. Abraham's having returned the contract unsigned. This was done and apparently the opinion rendered was that her act was tantamount to a resignation. Sims had an interview with Mrs. Abraham on Sunday, September 18. 'She told me she had refused to sign a contract on account of the stipulated salary. . . . She told me in the conversation that she thought she had been discriminated against the year before.' He says he doesn't remember her saying that she would teach for the coming year at the salary fixed by the board. I said, 'If you are not satisfied with the salary schedule, and not satisfied with the assignment given you, or, if you are not satisfied with anything, why did you send the contract back when it was presented to you, and that she had twenty days to work out any difficulty that might arise between her and the Board, or Mr. McIntire, or classification, or anything else, and she said she realized she had made a mistake.' He discouraged her from presenting herself on the following

day to teach, saying that McIntire could not allow her to do so. He admits that on September 20, when the board undertook to treat the return of the contract as a resignation on her part, it was advised that she had presented herself and claimed the right to teach.

"Respondent Whipple, clerk of the board, testified that 'Mrs. Abraham called me on Saturday preceding the meeting of the 20th and asked me to come over. She said she had something she wanted to talk to me about, but I didn't go and nothing about the contract was mentioned over the 'phone.' As to the reason for the action taken on September 20, he said: 'My feeling was that she was offered the contract at the regular rate, and had turned it down, and therefore, there was nothing else the Board could do.'

"Respondent Goodson, the third member of the board, testified that Mrs. Abraham came to his house on Saturday evening, September 17, and that 'she was very much disturbed about the contract, about not being able to sign the contract when she went to school the next morning, or that morning.' He told her the board would meet on September 20 and that she might be there if she wished. 'She stated then the salary was the reason she returned it,' i. e., the contract. She said she had sent it back with the idea of discussing that matter with McIntire. 'I took it that he didn't let her sign the contract because it had been returned to him the evening before and was in the safe there in the office and he had no authority to let her sign it.' Asked why the board made no effort to adjust matters with Mrs. Abraham, Goodson said: 'We have so much criticism on permanent teachers from a great majority of people in the district, and when Mrs. Abraham returned that contract unsigned, we took it as the same as her resignation; naturally we made no effort to adjust the salary schedule with her because of the feeling up there; and we wanted to get away from this permanent teaching, this tenure of office. That is the whole thing in a nutshell. There is no objection to Mrs. Abraham.' Her services, he said, were perfectly satisfactory. He was asked: 'The only reason you didn't take any action was you wanted to, if possible, evade the permanent tenure law?'· His reply was, 'Exactly'.

"On September 27 Mrs. Abraham wrote McIntire to the effect that she had not returned the contract 'other than

for information as to whether or not the salary therein mentioned was correct'; that the day following she had called at his office for the purpose of signing the contract 'and adjusting the salary to which I would be entitled later', but 'you refused to permit me to sign the contract and informed me that I was not entitled to teach during this year'; that if the board had accepted her action as a resignation it must have been because of his failure to inform it of the facts. She concluded: 'I am making demand upon you at this time for the delivery of my contract for my signature, and permission to resume my duties as a teacher in the Brawley Elementary Schools within my proper classification.'

"On October 4, 1932, she wrote the board a letter reciting that on September 19, 20 and 21 she had been present at the school to which she had been assigned but was prevented by McIntire from performing her duties and that on the latter date he had informed her that she would not be allowed to teach because the board had decided that the returning, unsigned, of the contract on September 16 amounted to a resignation, that she advised the board that she did not refuse to sign it but merely returned it to ascertain if the salary mentioned in it was correct 'because of my status as a permanent teacher'; also stating that on September 17 she had called at McIntire's office to sign the contract but had been told by him that the contract was locked up in the safe and that she would not be permitted to sign it.

"No attention was paid to either of these letters.

"The trial court found 'that the petitioner refused to accept and/or sign the contract so offered to her by respondents and gave, as her reason therefor, that the salary was not right; that at no time thereafter did she offer to teach for the salary specified in said contract, but has at all times herein refused to do so; that thereafter respondents placed another teacher in charge of the classes to which petitioner had been assigned.'

"It may be conceded that the testimony conflicts as to whether before the board's action of September 20, Mrs. Abraham refused to sign the contract presented to her. If she returned it merely to obtain further information on the subject of her salary, and made that clear to Mrs. Burris

or to McIntire, such action on her part could not be deemed a refusal to sign it. Mrs. Burris, McIntire and Sims have all quoted her as saying, either that she did refuse, or had refused to sign it. There is enough of a conflict, therefore, in the evidence so that, if nothing more had transpired, we would feel bound by the finding that she did so refuse. Such refusal, however, was not necessarily final. Even if her relations with the board had been purely a matter of contract she might lawfully have reconsidered her decision at any time before the board acted upon it at its meeting on September 20, at least if she did not in the meantime omit to perform, or offer to perform, her duties as a teacher. There can be no question from those passages from the testimony of respondents Sims and Goodson, which we have recited, that both of them knew prior to the board's meeting on that day that Mrs. Abraham's attitude was no longer, if it ever had been, one of unequivocal refusal to sign the contract, for, according to Sims, she had told him that she had in returning it 'made a mistake' and according to Goodson she was 'much disturbed' about her inability to sign the contract on Saturday morning. With this knowledge of her attitude, both of these men, who together constituted the majority of the board, participated at the meeting in treating her refusal to sign as definite. We are of the opinion that the evidence shows without any conflict that at the time they acted upon her supposed refusal to sign the contract, such refusal, if there ever had been one, had been, to their knowledge, so qualified that it could no longer be treated as such. The third member of the board knew at the time that she wished to communicate something to him, the nature of which he did not take the trouble to learn. Moreover, we do not think the record contains any substantial evidence that Mrs. Abraham would not have taught for the school year 1932–33 even had she been entitled to no greater salary than the $1,557 offered her, or that she ever actually refused to teach for that salary. Certainly, in presenting herself at the opening of the school, she manifested the willingness to perform her duties and take at least the chance that she might be found entitled to no greater salary than that. True, McIntire quotes her as saying that she 'was not willing to sign the contract and teach for that amount of money'. In the light of other evi-

dence the most she could have meant by this, if she said it at all, was that she was not willing to waive any additional salary to which she might be entitled. Again, if it be true, as McIntire claims, that when she called on Saturday, September 17, she neither asked to be allowed to sign the contract nor was she refused the opportunity to do so, she had the right to treat the statement which he says he made to her that morning, that he would submit the matter to the board at its meeting on September 20, as a promise to submit to the board the question, not of dispensing with her services, about which nothing seems to have been said at that time, but the matter of what her salary should be.

"Taking the evidence in the light most unfavorable to her, we think the most it can be said to show, so far as Mrs. Abraham's conduct is concerned, as of the time the board accepted what it saw fit to treat as her 'resignation', is that she had not affirmatively expressed a willingness to waive any excess over the $1,557 salary that might turn out to rightfully belong to her, or that the board might be willing to concede to her.

"No point seems to be made of the circumstance that Mrs. Abraham, for some reason, did not teach during the first month of the school year 1930–31, and we shall, for the purpose of this decision, assume that her status in the Brawley school district, as of the time that respondents, through McIntire and his clerk, Mrs. Burris, tendered her the contract for the year 1932–33, was that of a permanent teacher within the meaning of section 5.500 of the School Code.

"As was said in *Leymel* v. *Johnson*, 105 Cal. App. 694, 702 [288 Pac. 858] : 'The conclusion that the status of a teacher is that of an employee is irresistible. The position is secured by selection by the board of trustees and the terms of the employment are fixed by contract, the authority for which is found in the Political Code (sec. 1609). Under its general powers the board of education is authorized to enter into contracts with teachers and fix their compensation and terms of employment. (*Marion* v. *Board of Education*, 97 Cal. 606 [32 Pac. 643, 20 L. R. A. 197].)' The authority to employ teachers is now contained in article I of chapter I of part III of the School Code and the provisions in respect to fixing their compensation in

article I of chapter VIII of part III thereof. Notwithstanding, however, that the relation between a teacher and the board of trustees is essentially one of contract, and that, until the teacher has attained a permanent status, his or her reemployment in succeeding years is a matter purely in the board's discretion, the situation is so far modified by the teachers' tenure enactments (now represented by sections 5.500 to 5.504, both inclusive, of the School Code), that as said with respect to permanent teachers in *Dutart* v. *Woodward*, 99 Cal. App. 736, 739 [279 Pac. 493], 'the legislature has conferred upon teachers, under special circumstances, a vested right to be so classified and to teach as permanent instructors, in the particular district where this right has been secured, subject to such reasonable rules as may be adopted, which are not in conflict with law'. The result of these enactments was not to make the relation any the less one originating in contract, but to annex to contracts òf employment when repeated for a sufficient time certain legal consequences. These consequences are not contractual except in the broad sense of being annexed by operation of law to the contract and have been said to be 'in the nature of a civil service regulation'. (*Buckbee* v. *Board of Education*, 115 App. Div. 366 [100 N. Y. Supp. 943, 950], cited in *Fidler* v. *Board of Trustees*, 112 Cal. App. 296, 305 [296 Pac. 912].) One of the consequences is a permanent right to teach so long as the board's reasonable regulations are complied with, save in certain exceptional circumstances with which we are not here concerned. This right to teach is an incident to classification as a permanent teacher and after three consecutive years of employment and service, and re-election by the board for the next succeeding school year, the law as of the beginning of that year automatically effects the classification and nothing more is required to accomplish it. (School Code, sec. 5.500; *Grigsby* v. *King*, 202 Cal. 299, 307 [260 Pac. 789]; *Owens* v. *Board of Education*, 68 Cal. App. 403, 405, 406 [229 Pac. 881]; *La Shells* v. *Hench*, 98 Cal. App. 6, 13 [276 Pac. 377]; *Gastineau* v. *Meyer*, 131 Cal. App. 611, 617 [22 Pac. (2d) 31].) It was said in the Buckbee case that the board's obligation is merely 'to re-employ the teacher from year to year, as if taken from an eligible list of the civil service'. Under our statute, however, no affirmative action of the board is requisite to accom-

plish such reemployment. It is automatically done by virtue of sections 5.500 and 5.401 of the School Code, and a permanent teacher need not even notify the board of his acceptance, such notice under section 5.402 being only required of those not 'under permanent tenure'. The manifest implication is that unless he notifies the board to the contrary or fails to appear for the purpose of teaching at the opening of the school year he must be deemed to have accepted the reemployment. In these circumstances it is questionable whether under our own system what has occurred is very happily described as a 'reemployment' at all and whether it would not be more aptly designated as a 'continuance of an employment'. It is perfectly true, as said in *Martin* v. *Fisher,* 108 Cal. App. 34, 39 [291 Pac. 276], that 'the position of a teacher in the public schools of California is not an office'. It is strictly an employment and initiated by a contract. But, as said in the case last cited: 'The becoming of a permanent teacher, and the continuation of this employment, is a right given by statute. . . . '

▮ "The legislature in this state designed to give to teachers, under the defined conditions, a permanency of tenure, but this has, however, been held to carry with it no assurance against change in salary. That phrase of the subject has been so ably discussed in *Fidler* v. *Board of Trustees, supra* (pp. 301, 305), that it is needless to enlarge upon it here. The power of the trustees to raise or reduce the salaries of permanent teachers cannot be doubted, provided it is reasonably exercised and no attempt is made after the beginning of any particular school year to reduce the salaries for that year. No more can it be doubted that despite the permanency of a teacher's tenure the board is fully empowered to change his assignment, and from time to time to prescribe his duties, so long as such power is reasonably exercised and the duties prescribed are in the line of his profession and he is not required to teach outside the district. (*Dutart* v. *Woodward, supra.*) It was said, however, in *Fidler* v. *Board of Trustees, supra* (p. 301): 'Respondents do not contend, however, that there can be any arbitrary or unreasonable exercise by the board of the power to reduce the salary of a permanent teacher,' and with respect to the assignment of duties it was said in *Dutart* v. *Woodward, supra,* that 'for the refusal on the part of the

teacher to comply with . . . unreasonable or dangerous assignments, the board would have no legal authority to prefer charges against the teacher and deprive her of her lawful status as a permanent teacher'.

"In the instant case Mrs. Abraham seems to have entertained the belief that she had been discriminated against in an arbitrary way in the matter of her salary; that instead of its reduction having been made on the basis of the sum that she should have received the previous year, it had been made on the basis of a lesser sum than she had been required to accept for that year. We cannot possibly determine from the present record whether she had, on that score, any just ground for complaint or not, but we are emphatically of the opinion that her whole conduct, as shown by the record, and as known to at least a majority of the board when it undertook on September 20, 1932, to accept her 'resignation', presented no 'resignation' for their acceptance. Counsel for respondents insist that *Fidler* v. *Board of Trustees, supra,* to which we have referred, and with which, as to much of what is said in the opinion we agree, requires an affirmation of the judgment here. The petitioner in that case, who occupied the status of a permanent teacher, had for the school year 1928–29 been employed as a vice-principal at a salary of $2,900. The board of trustees, having decided to assign to him duties for 1929–30 that only involved teaching, offered him a contract for that year at $2,500. This led to correspondence back and forth, including a letter under date of June 17, 1929, in which he informed the board that 'I have refused your offer of contract', referring to grounds set out in a previous letter in which he had disputed the board's right to reduce his salary. He went on to say, however, that he maintained his right to continue as a permanent teacher under his former salary. At the beginning of the school year he presented himself but was assigned no duties. The board thereupon wrote him asking him to teach, reiterating its willingness to pay him the $2,500 salary, and saying that unless he commenced teaching it would be forced to conclude that he refused employment. He replied that he was ready to teach, that no teaching had been assigned him, but that he should 'expect to be paid the sum to which I am legally

entitled, whether it be twenty-five hundred dollars or twenty-nine hundred dollars'.

''The court said of the correspondence: 'We think these letters manifest a refusal on the part of appellant to accept the offered contract. Conceding, however, only for the purpose of discussion, appellant's contention, that he was willing to work for $2,500 per year, leaving the amount of his compensation to be determined later by litigation, or otherwise, to be meritorious, it is met and overcome by conflicting evidence,'. This conflicting evidence was, according to the opinion, a stipulation that witnesses would testify that by reason of petitioner's *refusal* to accept the precise terms of the board's offer 'and by reason of the position and demands of petitioner', the board made other arrangements for the performance of the duties assigned to the petitioner, and that, therefore, its offer to him was deemed finally rejected by him and no longer subject to acceptance. The court declared itself bound by the trial court's determination of this conflict in the evidence and concluded that there must be held to have been a 'refusal to teach' which was 'of course tantamount to a resignation'. No hearing in the Supreme Court was requested. We shall not conceal our inability to see the conflict in the evidence deemed by the court to exist nor our view that the result reached was an unsatisfactory conclusion to an opinion otherwise luminous and instructive. Without attempting to draw any tenuous distinctions we can only say that we do not subscribe to the view that a teacher is bound to abandon views held in good faith as to the compensation to which he or she is entitled, on pain of forfeiture of permanency of status, and that, in the case at bar, it is abundantly manifest that there was, on petitioner's part, no 'refusal to teach' and no 'resignation' for the board to consider.''

The judgment is reversed.

SHENK, J., Dissenting.—I am unable to concur. The appeal is from a judgment after a full and fair trial on the merits. The trial court made findings in favor of the respondents. These findings are in part supported by uncontradicted evidence and otherwise by substantial though conflicting evidence. From these findings it appears that the petitioner occupied a position as teacher in the district

during the school year 1931–1932 at a salary of $1600. On April 18, 1932, the respondent board reduced the salaries for the following year of all teachers receiving that amount, to $1557. On the following day the petitioner was notified of the reduction. A contract calling for the reduced salary was prepared and presented to her for her acceptance and signature. She refused to accept or to sign the same and gave as the reason for her refusal that the salary was not right. At no time has she offered to teach for the salary specified in said contract and at all times has refused to do so. The respondents then placed another teacher in charge of the classes to which the petitioner had been assigned. The trial court concluded that, although the petitioner had attained the status of a permanent teacher, her conduct in refusing to teach at the salary fixed by the board was tantamount to a resignation.

It may be conceded that there is evidence on which contrary findings might have been based, but it is apparent to me that the court in the prevailing opinion has entered the domain of the trial court by testing the credibility of the witnesses and weighing the evidence. In my opinion the petitioner has not on the record justified a reversal of the judgment.

Waste, C. J., concurred.