[Civ. No. 26898.   Second Dist., Div. One.   Aug. 5, 1963.]

WILLIAM H. BARNES et al., Plaintiffs and Appellants, v. THE BOARD OF TRUSTEES OF MT. SAN ANTONIO COLLEGE DISTRICT, Defendant and Respondent.

Mosk & Rudman and Norman G. Rudman for Plaintiffs and Appellants.

Harold W. Kennedy, County Counsel, James W. Briggs

and Raymond W. Schneider, Deputy County Counsel, for Defendant and Respondent.

FOURT, J.—This is an appeal from a judgment wherein petitioners' application for a writ of mandate was denied.

A résumé of some of the facts as established by the proceedings is as follows: Mt. San Antonio College, hereinafter sometimes referred to as "Mt. San Antonio," is a junior college of this state with its administration vested in the respondent board of trustees, hereinafter sometimes referred to as the "board." The petitioners are teachers permanently employed by the college district. Bender holds the degree of Doctor of Philosophy and Barnes hold the degree of Master of Arts, each of which degrees was given at San Gabriel College in June of 1959 for work and study theretofore performed at said college. Before undertaking the study and work involved leading up to the granting of such degrees the petitioners secured the board's approval and the petitioners undertook and completed the work and study involved in securing said degrees in reliance upon the statements of the board and its representatives that petitioners would receive salary increases from respondent for their services at Mt. San Antonio when and if the higher degrees were earned. The board in 1959-1960 accepted and recognized petitioner's respective degrees for classification and placement on the salary schedule. The board annually published a "Certified Salary Schedule" which made provision for salary classification of teachers according to achievement and years of employment with respondent, or years of prior teaching experience. Barnes was paid in 1959-1960 as being in a specific category on the schedule. The rating he received recognized the earning of the master's degree. Bender, in recognition of his doctor's degree was paid accordingly. Until March 18, 1960, no salary distinction was made between holders of advanced degrees whose degrees had been earned prior to June 30, 1959, based upon the accreditation of the institution of learning from which the respective degrees may have been earned. San Gabriel College is not an accredited institution.

The 1959-1960 salary schedule under the title "Additional Information on the Salary Schedule" provided under a subtitle "General Policies Regarding Acceptable Units for Advancement" that "B. Degrees earned will be accepted for cross-over to appropriate column. Faculty members who have been given approval-of-work toward degrees in non-accredited institutions will receive credit for those degrees when

awarded. After June 30, 1959, only degrees from accredited institutions will be accepted." The document just referred to also provided:

"D. Our basic obligation at Mt. San Antonio College is to teach and influence young people. As faculty members increase their ability to teach effectively, they show professional growth and their remuneration should increase. In our early salary schedules, the only way to achieve the highest step was by earning a Doctor's Degree.

"As we examined this requirement, we realized that it was not consistent with our philosophy. It became obvious that one could show professional growth by pursuing a program of study that would increase teaching effectiveness at this College as well as by a Doctor's Degree. With teaching effectiveness, then, as the basic concept for advancement, the Permanent Salary Sub-Committee has been evaluating courses submitted to it not only as to the Major or Minor background of the person submitting, but whether this course will actually result in professional growth. The Dean or Department Head in the area where the teacher is working will be consulted, when necessary, by the Permanent Salary Sub-Committee to help them in evaluation.

"Therefore, as faculty members submit application for course approval, they should read the above and be sure that the request they are making is consistent with this philosophy."

As heretofore stated, prior to March 18, 1960, the board had recognized and accepted the degrees of petitioners earned at San Gabriel College for salary purposes. On March 18, 1960, the board adopted a distinction between degrees received from accredited and degrees received from nonaccredited institutions. The salary schedule following the action of the board on March 18 to set up a special column category for "persons who earned the indicated advanced degrees from institutions which were not then accredited." The petitioners in 1960-1961 were accorded recognition of their degrees to the extent that petitioners were placed in the same column and step rating on the salary scale which would have been accorded had the degrees been fully recognized. The minutes of the meeting of March 18, 1960, disclose that the board was fully informed as to what was done[1] at that meeting.

---

[1] "The Board of Trustees of Mt. San Antonio College met at 11:25 a.m. on Friday, March 18, 1960, to discuss degrees earned from non-accredited institutions and presented for either classification and placement on the salary schedule or for recognition in the catalogue. . . .

"The meeting was called to order. . . . President Harmsen reported

For the school year 1961-1962 and thereafter respondent entirely withdrew its prior recognition of petitioners' degrees. Petitioners continually asserted their right to be rated according to the achievement of their degrees and the prior recognition thereof by respondent in the school year 1959-1960.

The trial court found that the petitioners acquiesced in the actions of the respondent in reducing their salary ratings and that they had waived their rights with respect to this action and further that Barnes was estopped from maintaining

that he . . . had consulted with Dr. C. C. Trillingham and Dr. C. C. Carpenter of the County Office regarding the resolution of the Board to recognize degrees earned at a non-accredited institution. These men had discussed the problem with representatives from the office of the County Counsel, and had been advised that the College Board has the right to reverse a previously adopted resolution relative to recognizing degrees earned at a non-accredited institution.

"After discussion, it was moved, . . . seconded, . . . that as of this date, the Board of Trustees of Mt. San Antonio College will not recognize the degrees earned at non-accredited institutions by . . . William H. Barnes—Master of Arts; Hallock J. Bender—Doctor of Philosophy; . . . Motion unanimously carried.

"It was moved . . . seconded . . . that the Board of Trustees will accept degrees earned from accredited institutions or from such non-accredited institutions as are accredited by the State Department of Education in granting California teaching credentials. Motion unanimously carried.

"It was moved . . . seconded . . . that for the four instructors who have been pursuing degrees at a non-accredited institution, the Board of Trustees adopt the following agreement:

"1. That for a period of three years, these instructors be paid a salary that is half-way between the column and step they are now placed on the salary schedule, by reason of degrees earned at a non-accredited institution, and the corresponding column and step just below, upon the following conditions:

"A. That they have been accepted as M.A. or doctorial candidates in an accredited institution during the school year 1960-1961;

"B. That they sign a statement of intent to fulfill the requirements of "A" above prior to May 1, 1960;

"C. That they demonstrate progress, at the close of each school year, in their program;

"D. If, at the close of any of the years included in the three year period, the candidate has not fulfilled the agreement, he will be placed on the salary schedule where he would be without the degree earned in a non-accredited institution.

"2. If at the end of three years the following instructors . . . William H. Barnes, Hallock J. Bender . . . have ·not received the specified degree, barring extenuating circumstances, they will be placed on the salary schedule where they would be without the degrees earned at the non-accredited institution. Motion unanimously carried.

"It was moved . . . seconded . . . that Dr. Edinger be instructed to prepare an Agreement of Intent and to meet with the four instructors involved to report the action of the Board. Motion unanimously carried.

"The Board adjourned to meet in regular session at 11:00 a.m. on Thursday, April 7, 1960."

any action. In short, the court also concluded that respondent acted within its powers in distinguishing for salary purposes the degrees from San Gabriel College and degrees from "accredited" institutions notwithstanding the fact that respondent had recognized those degrees and had paid petitioners accordingly in 1959-1960. The alternative writ of mandate was discharged and petitioners were denied a writ of mandate and this appeal followed.

There are no issues of fact on the appeal. Appellants contend that the board acted unreasonably, arbitrarily and capriciously in reducing petitioners' salary ratings so as to withdraw recognition of their advanced degrees for the school year 1960-1961 and thereafter.

Respondent knew and was fully aware of all the material facts with reference to petitioners' advanced degrees earned at San Gabriel College. Respondent accepted and recognized the degrees knowing that San Gabriel was not accredited by the Western College Association. In fact the board warned teachers in the salary schedule for the year 1959-1960 that after June 30, 1959, degrees earned at unaccredited institutions would not be recognized for salary purposes. No reason was given in the minutes of March 18, 1960 (or at any other time until the petition for writ of mandate was filed), for the action taken by the board. It was set forth in conclusionary fashion in the answer that the work required by San Gabriel College for advanced degrees was not comparable to the work required by accredited institutions for corresponding higher degrees. No evidence was offered in this connection and as heretofore pointed out no reference to any supposed low academic level of San Gabriel College was mentioned by the board in any of its proceedings or otherwise. There is nowhere in any of the proceedings any recital of what accreditation means, how it is obtained, in what sense the possession of accreditation by the Western College Association enlarges a school's stature nor in what sense the lack of any such accreditation diminishes it.

*Aebli* v. *Board of Education,* 62 Cal.App.2d 706 [145 P.2d 601], is the leading case in California on the subject matter and we think is dispositive of the matter here. There the court stated at page 753: "The real question presented is whether the board in 1932 had power to review the service status ratings of these teachers years after the ratings were given, in cases where the original ratings were not based on fraud, error, or mistake, and were valid when given, and to re-rate

and classify, for salary purposes, a group of teachers solely because the board as it existed in 1932, believed the original ratings were too high. In our opinion such a classification has no reasonable basis, is unreasonable and arbitrary, and was beyond the power of the board.

"There can be no doubt but that the board possesses the power to reduce salaries at the commencement of a school year, even of permanent employees with tenure, provided that there is a reasonable basis for such a reduction and provided the reduction is not the result of an unreasonable, arbitrary, or capricious act. (*Cleeves* v. *Board of Education,* 22 Cal.App. 2d 183 [70 P.2d 645]; *Fidler* v. *Board of Trustees,* 112 Cal. App. 296 [296 P. 912]; *Abraham* v. *Sims,* 2 Cal.2d 698 [42 P.2d 1029]; Annotations 110 A.L.R. 800; 113 A.L.R. 1495; 127 A.L.R. 1298.) But this power is not unlimited. The board has no power to discriminate against any teacher. It cannot pick out some teachers in a particular category, and without a change in duties or functions, classify that group for salary purposes different from others in the same category (*Fry* v. *Board of Education,* 17 Cal.2d 753 [112 P.2d 229]), nor can it reduce salaries in an arbitrary, capricious, or unreasonable manner. (*Kacsur* v. *Board of Trustees,* 18 Cal. 2d 586 [116 P.2d 593].)"

The court in the *Aebli* case thereafter in speaking of the power of the board to reduce prospectively the salaries of teachers on the basis of certain outside experience which had been acquired by them at the time of their first employment from a rating to which at that time they were properly entitled on that experience under the then existing rules of the board said, pages 757, 758:

"If a school board could thus change the service status rating of those already in the department every time the personnel of the board happened to change, or every time the members of the board determined to change policy, the teachers would have no security at all in their employment and in their seniority rights. There can be no doubt but that the board could impose a horizontal salary cut on all those within certain ratings. This was done by the several resolutions that 'froze' the salaries of certain teachers for certain years. But the teachers are protected against any arbitrary reduction in rank or rating. *When the board has once adopted a policy and, without fraud, error or mistake, rates a teacher under that policy, although the board may change its policy as to new entrants into the department, it has no power years later*

to go back and review that teacher's case, and to rerate that teacher prospectively, on the theory that the original rating was too high. The board having once acted lawfully in rating a teacher has exhausted its power over that subject matter.

"The theory of the trial court, as disclosed in the findings above quoted, and as disclosed in that portion of the trial court's opinion quoted in the dissent, was that the board, prior to the beginning of a school year, has the power to offer any teacher a contract at any salary, and if the teacher accepts by continuing to teach, a valid contract comes into existence. For this reason the trial court was of the opinion that the reclassification of 1932 was not arbitrary or capricious, and was made in good faith."

Further, at pages 759-760, the court in the *Aebli* case said: "But it was only if an error had been committed that the board would have had power to reclassify these teachers (without a change in duties and functions) differently from other teachers in their service status group. What the trial court did was to say that although no error was committed in the original classification of these teachers, the board had power to offer a lower salary to these teachers than that offered other teachers in their same category. As a matter of law, for the reasons fully stated in the *Kacsur* and *Fry* cases, *supra*, such classification was arbitrary and capricious, and unreasonable.

"It should be pointed out that no changes in duties or functions or hours of work were involved in the reclassification of 1932. Teachers in a particular service status rating continued to perform the same duties and functions, and work the same hours, as all others in that rating, but were reduced to a lower rating for the reasons above pointed out.

"Some significance must be given the service status rating of a teacher. Seniority rights in the department depend upon that rating. A teacher may not be subjected to being divested of those rights every time a new policy is adopted by the board.

"For these reasons, the classification, prospectively, of the teachers in this group in 1932 must be held to be invalid, and the portion of the judgment based thereon must be reversed."

There was a vigorous dissent by Justice Knight to the opinion with reference to the very matters heretofore quoted. A petition for a hearing was denied by the Supreme Court.

Respondent has commendably admitted in its brief that appellants are correct in their contentions with reference to re-

spondent's claim of acquiescence by petitioners in the board's action and the claim that Barnes was estopped to maintain any action; consequently those matters are no longer issues in the case.

The judgment is reversed and the writ of mandate shall issue as prayed for.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied August 29, 1963, and respondent's petition for a hearing by the Supreme Court was denied October 1, 1963.