[Civ. No. 3094. Fifth Dist. June 17, 1977.]

CALIFORNIA TEACHERS ASSOCIATION et al.,
Plaintiffs and Respondents, v.
GOVERNING BOARD OF MARIPOSA COUNTY UNIFIED
SCHOOL DISTRICT, Defendant and Appellant.

## Counsel

J. B. Eckerson, County Counsel, and Hugh M. Flanagan for Defendant and Appellant.

Rowell, Lamberson, Thomas & Hiber and Ernest H. Tuttle for Plaintiffs and Respondents.

## Opinion

**BROWN (G. A.), P. J.**—This cause comes before the court on an agreed statement pursuant to California Rules of Court, rule 6(a). The pivotal issue is the right of Jerry Colsten, a certified tenured teacher with the appellant school district, to be reinstated effective as of the inception of the school year 1975-1976, he having failed through forgetfulness to return his contract or to notify the board of trustees of his intention to

remain in the service of the district by the July 1, 1975, deadline as required by Education Code[1] section 13260.[2]

Colsten had been employed as a teacher by the district for approximately 10 years. On April 23, 1975, the district offered contracts to its permanent teaching personnel, including Colsten. The offer of employment specified that if Colsten's acceptance was not received by appellant by July 1, 1975, the offer would be withdrawn.

Thereafter Colsten failed to notify the board or any of its agents, either orally or in writing, prior to July 1, 1975, of his intention to remain in the service of the district. At all times, though, Colsten intended to teach for and remain an employee of the school district. He had signed his contract on May 27, 1975, simply mislaid it in his own home and, due to his inadvertence, forgot to return it to the governing board as required. Colsten offered no other excuse, explanation or extenuating circumstances for the failure to return the contract on time or otherwise notify the district by the July 1, 1975, deadline of his intention to continue to teach. On July 7, 1975, the superintendent of the school district directed a letter to Colsten advising him that, pursuant to section 13260, by failing to return the contract by July 1, 1975, he was deemed to have declined employment for the 1975-1976 school year.

Colsten received the letter from the superintendent on July 8, 1975. Through a representative he contacted the superintendent and urged that he be reinstated and requested a meeting be held as soon as possible with the superintendent.

Such a meeting was held on July 16, 1975, at which time Colsten firmly stated to the superintendent that he always intended to teach in the school district for the 1975-1976 school year and that he wished to be reinstated immediately. The superintendent replied to Colsten that he was applying the "letter of the law" and therefore refused to reinstate him.

---

[1] All references will be to the Education Code unless otherwise indicated.

[2] Section 13260 provides: "If, without good cause, a permanent employee of a school district fails prior to July 1st of any school year to notify the governing board of the district of his intention to remain or not to remain in the service of the district, as the case may be, during the ensuing school year if a request to give such notice, including a copy of this section, shall have been personally served upon him, or mailed to him by United States certified mail with return receipt requested to his last known place of address, by the clerk or secretary of the governing board of the school district, not later than the preceding May 30th, he may be deemed to have declined employment and his services as an employee of the district may be terminated on June 30th of that year."

On July 21, 1975, the board held its regular meeting for the month of July, the first meeting since the expiration of the July 1 deadline. The board provided Colsten with notice and opportunity to be heard at this meeting. Immediately prior to the commencement of the meeting Colsten delivered personally to the superintendent and each member of the board a signed copy of his contract and a formal notice of acceptance of a teaching position with the school district for the 1975-1976 school year. Colsten's sole testimony concerning "good cause" was that he had forgotten to return his contract. After having heard evidence at this hearing, the board decided that Colsten's failure to return the contract should be deemed to have been an automatic declination of employment and therefore that Colsten would not be continued in a teaching position in the 1975-1976 school year.

Prior to the hearing on July 21, 1975, the board had taken no action to terminate Colsten's employment or to employ another teacher to replace him and did not suffer any prejudice, detriment, harm or injury of any type due to Colsten's failure to return his contract by the deadline date.

On August 12, 1975, the California Teachers Association and Colsten initiated the present proceeding in mandamus pursuant to Code of Civil Procedure section 1085.

The trial court issued the writ directing Colsten's reinstatement for the school year 1975-1976 after having found and concluded that the board did not have the power to deem Colsten to have declined employment, that the board abused its discretion in acting to terminate Colsten's employment, that Colsten's inadvertence in failing to notify the board of his intent to remain constituted "good cause" within the meaning of section 13260 and Colsten's notification of the school board of his intention to return prior to the board's deeming that he had declined employment was the withdrawal of an implied resignation.

■  We affirm on the sole ground that the evidence supports the trial court's determination that the board abused its discretion in acting to terminate Colsten's employment.

■  Colsten contends, and the trial court found, that section 13260 is an implied resignation statute and not a statute imposing a requirement of notification by July 1 of intention to be reemployed as a condition to reemployment. The argument continues that since the section is an implied resignation statute, the board was required to make a finding of whether or not Colsten intended to resign in failing to return his contract

by July 1 as well as a finding that the failure was without good cause before the board could apply the code section and deem the failure to constitute a declination of employment. Colsten concludes that since the evidence was without contradiction that he did not intend to resign and that he withdrew his declination of employment before the board acted, the board was required to employ him for the 1975-1976 school year. We do not agree.

In support of this position Colsten relies primarily upon *Abraham* v. *Sims* (1935) 2 Cal.2d 698 [34 P.2d 790, 42 P.2d 1029]. In that case a permanent school teacher handed her contract back to the governing board's agent unsigned and asked that the governing board reconsider the contract because the teacher did not consider the salary stated to be sufficient. The board understood the teacher's act to indicate that she would not teach at the salary stated and therefore considered her failure to sign the contract as an expression of her intent not to accept employment for the coming school year. The teacher, upon learning that the board had determined she did not wish to teach in the coming year, undertook prior to the board's next meeting to convince the board that she had not intended to refuse the contract. Nonetheless, at the board's next meeting it purported to accept her resignation. The Supreme Court, finding no requirement of acceptance by a tenured teacher of her position for the following school year, concluded that "unless [the teacher] notifies the board to the contrary or fails to appear for the purpose of teaching at the opening of the school year he must be deemed to have accepted the reemployment." (*Abraham* v. *Sims, supra,* 2 Cal.2d 698, 711.) Therefore, the court concluded that the teacher had a right to withdraw her supposed resignation prior to action by the board on it, that she had successfully done so, and that the board had therefore abused its discretion in attempting to accept the "resignation."

Colsten argues that section 13260, originally added to the code in 1943 as section 13003.1 (Stats. 1943, ch. 833, p. 2629), was passed by the Legislature to modify the *Abraham* decision by moving up the date of the teacher's failure to appear to July 1 of each year in order to provide the board with adequate knowledge of the openings which would become available in the coming school year. Thus, following Colsten's argument through, section 13260 is an implied resignation statute and modifies the *Abraham* holding to permit the teacher to continue in his or her employment for the coming school year unless the teacher expressly resigns or impliedly resigns by failing to meet the July 1 deadline. Colsten would have this court apply the *Abraham* holding to conclude that the teacher may withdraw either his or her express resignation or

implied resignation pursuant to section 13260 prior to the board's action in accepting the resignation. Colsten's conclusion is that by accepting the offer of employment prior to the July 21, 1975, board meeting, he successfully withdrew his implied resignation and therefore the board was without power to deem him to have declined employment pursuant to section 13260.

There are a number of reasons why we reach a contrary conclusion. At the time of the *Abraham* decision neither section 13258[3] nor 13260 nor their predecessor school code sections were part of the code. Thus there was no deadline date for the teacher to accept employment for the succeeding school year. Since the adoption of section 13258 a teacher "elected for the next ensuing school year . . . shall be deemed reelected from year to year *except* as provided in [section 13260] . . . ." (Italics added.) Section 13260, of course, requires notification of the board of "intention to remain or not to remain in the service of the district, . . ." before July 1. Clearly the requirement of notification by the deadline date is a precondition to employment for the ensuing school year.

Next, in addition to being entitled "Automatic Declining of Employment," section 13260 is included in article 3 of division 10, chapter 2, entitled "Employment," rather than in article 5 of division 10, chapter 2, dealing with "Resignation, Dismissal and Leave of Absence." The title and placement in the code suggests the July 1 acceptance deadline is a condition of employment rather than a date at which a teacher's resignation will be implied.

Thirdly, the statute as it was originally passed does not support Colsten's assumption that it was designed to modify the *Abraham* holding by permitting the teacher to continue in his employment for the coming year unless he expressly resigns or impliedly resigns by failing to meet the July 1 deadline. The original version of the statute was numbered section 13003.1 (Stats. 1943, ch. 833, p. 2629) and provided not that an employee would be deemed to have declined employment but rather that "all credentials and certificates held by such employee may be suspended for not exceeding one year by the issuing authorities thereof." Thus, reading the initial language of the code section as Colsten urges would result in the absurd construction that the board must first determine if the employee by failing to respond by July 1 of

---

[3]Section 13258 provides in pertinent part: "Persons in positions requiring certification qualifications may be elected for the next ensuing school year on and after the 15th day of March, and each person so elected shall be deemed reelected from year to year except as provided in . . . [section 13260] . . . ."

the year had an actual intent to resign before the board could suspend him for one year. The automatic declination language was not added by the Legislature until 1969 (Stats. 1969, ch. 540, § 1, p. 1168), even though from the outset the Legislature included a provision in the codes for automatic declination of employment by a probationary employee who fails to respond by the deadline date. (Stats. 1943, ch. 71, p. 549, § 13003; now see § 13259.)

Finally, for the court to read section 13260 in the manner urged by Colsten would either require that the phrase "without good cause" be treated as superfluous or result in the absurdity of the statute providing the employee two opportunities to avoid the operation of the statute with the same argument. With regard to the good cause requirement, if the board were to find that the employee in fact intended his failure to respond to express a desire to resign, neither the board nor the employee would have need of the good cause phraseology. On the other hand, if the board finds that the employee did not intend his failure to indicate an intent to resign, then again the good cause requirement would be meaningless, because it would never be reached. In fact, the only way in which the good cause requirement can have meaning in the statute is if failure to return the contract by July 1 is automatically deemed a declining of employment. Under that reading an employee would still be able to avoid the operation of the statute if he could demonstrate good cause for his failure.

Based on the foregoing, it is concluded that the failure to return the contract by July 1 was an automatic declining of employment. Accordingly, the board could terminate Colsten's employment unless it found the failure to return was with good cause. However, as will hereinafter be expatiated, though the failure to return the contract was without good cause, the board's action under the last phrase of section 13260 is subject to trial court review to determine if the board abused its discretion.

■ Adverting to the question of whether Colsten satisfied his burden of showing "good cause" for not returning the contract by July 1, the issue narrows to whether forgetfulness or inadvertence, without more, may be equated with good cause, there being no facts in the record bearing upon any underlying excuse for the forgetfulness, such as illness, absence, reliance on others, or the like. There are no cases interpreting the language as used in this statute. Neither have we found any reported cases in analogous situations where relief from meeting a time limit on a showing of good cause has been based only on the thin reed of forgetfulness of the party affected. ■ There is some helpful language

in these cases, however. They indicate that " ' "[g]ood cause" must be so interpreted that the fundamental purpose of the legislation shall not be destroyed.' " (*Gibson* v. *Unemployment Ins. Appeals Bd.* (1973) 9 Cal.3d 494, 499, fn. 8 [108 Cal.Rptr. 1, 509 P.2d 945], quoting from *Cal. Portland Cement Co.* v. *Cal. Unemp. Ins. Appeals Board* (1960) 178 Cal.App.2d 263, 272 [3 Cal.Rptr. 37].) In *Gibson* the Supreme Court pointed out that, liberally construed, the term "good cause" signifies " ' "real circumstances, substantial reasons, objective conditions, palpable forces that operate to produce correlative results, adequate excuses that will bear the test of reason, just grounds for action, and always the element of good faith. . . ." ' " (*Gibson* v. *Unemployment Ins. Appeals Bd., supra,* 9 Cal.3d 494, 499, fn. 8; see also *Faulkner* v. *Public Employees' Retirement System* (1975) 47 Cal.App.3d 731, 737 [121 Cal.Rptr. 190].)

■ Obviously, forgetfulness or inadvertence alone does not satisfy these criteria. To hold that forgetfulness alone is sufficient to satisfy "good cause" would be to render the phrase totally meaningless. We decline to so hold and therefore conclude that the stipulated facts herein do not meet the requirements of "good cause."

As we have indicated, however, our inquiry does not stop with a finding of lack of good cause. ■ The language of section 13260 necessitates a further discretionary determination of declination of employment. The last phrase of that section states that when without good cause a teacher fails to notify the governing board by July 1 of his intention to remain, "he *may* be deemed to have declined employment."[4] (Italics added.) The use of the discretionary word "may" gives the board authority to decide whether or not a finding that the teacher has declined employment is appropriate. ■ "The word '*may*' is used and not '*must*,' clearly denoting a discretion on the part of the judge exercising jurisdiction over the proceeding. . . . [¶] 'The ordinary meaning of "shall" or "must" is of mandatory effect, while the ordinary meaning of "may" is purely permissive in character. . . .' " (*People* v. *Durbin* (1963) 218 Cal.App.2d 846, 849 [32 Cal.Rptr. 569] (quoting 27A Words and Phrases (permanent ed.) p. 674); see also *People* v. *Balt* (1947) 78 Cal.App.2d 171 [177 P.2d 362].)

■ The discretion referred to is not a whimsical, uncontrolled power but a legal discretion, subject to reversal where no reasonable basis for

---

[4]This discretionary language is to be contrasted with the mandatory "shall be deemed to have declined the employment" contained in section 13259 pertaining to nontenured teachers who fail to signify their acceptance of an offer of employment within the time limit specified in that section.

the action is shown. In *Gossman* v. *Gossman* (1942) 52 Cal.App.2d 184, 195 [126 P.2d 178], the court adopted the classic statement: " 'By such expression is implied absence of arbitrary determination, capricious disposition, or whimsical thinking. An exhibition of ungoverned will, or a manifestation of unbridled power is not the use of discretion. The word imports the exercise of discriminating judgment within the bounds of reason. Discretion in this connection means a sound judicial discretion, enlightened by intelligence and learning, controlled by sound principles of law, of firm courage combined with the calmness of a cool mind, free from partiality, not swayed by sympathy nor warped by prejudice nor moved by any kind of influence save alone the overwhelming passion to do that which is just.' " In *Sharon* v. *Sharon* (1888) 75 Cal. 1, 48 [16 P. 345], the Supreme Court said: "In a legal sense, discretion is abused whenever, in its exercise, a court exceeds the bounds of reason,—all the circumstances before it being considered." (See also *Benjamin* v. *Dalmo Mfg. Co.* (1948) 31 Cal.2d 523, 525-526 [190 P.2d 593]; *Bailey* v. *Taaffe* (1866) 29 Cal. 422, 424; *Crummer* v. *Beeler* (1960) 185 Cal.App.2d 851, 858 [8 Cal.Rptr. 698].)

■ Applying these legal standards to the facts and circumstances of this case, we believe the trial court correctly decided that the board had abused its discretion in refusing to reemploy Colsten.

■ The obvious purpose of section 13260 is to provide the school board with such advance notice of openings in the coming school year that it can properly undertake to fill its employment needs. ■ Here, however, the board had taken no action whatsoever to employ another teacher to replace Colsten and did not suffer any prejudice, detriment, harm or injury of any type due to Colsten's inadvertent failure to return his contract by the deadline date. Moreover, beginning with the superintendent's letter of July 7 and extending through the meeting of July 16, the superintendent took the hard line position that the district would stick by what he considered to be the letter of the law, that is, that since the contract was not returned the district could arbitrarily and without any further reasoned judgment decline to employ Colsten. Since the district had taken no action as of the July 21 meeting date to replace Colsten and it had notice through its superintendent of the nonreturn of his contract since July 1, the purpose of the section would in no way have been detracted from or impaired by the retention of Colsten. Under these circumstances, and particularly in the face of positive knowledge since July 8 that Colsten wished to be reemployed, the action of the

superintendent and the board in refusing to retain him was, under the aforementioned legal tests, arbitrary, capricious and beyond the bounds of reason. We therefore conclude the trial court was correct in finding that the board abused its discretion in acting as it did.

■ The board also argues for the first time on appeal that Colsten's proper remedy was administrative mandamus pursuant to Code of Civil Procedure section 1094.5, rather than ordinary mandamus under Code of Civil Procedure section 1085, and that the trial court therefore applied the wrong standard in reviewing the action of the board.

The board is unquestionably correct in its initial analysis that administrative mandamus under Code of Civil Procedure section 1094.5 was the appropriate remedy under the provisions of that section making it applicable to "inquir[e] into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in the inferior tribunal, corporation, board or officer. . . ." Accordingly, had the inappropriateness of proceeding under ordinary mandamus pursuant to Code of Civil Procedure section 1085 been raised in the trial court, Colsten unquestionably would have been required to relabel his petition and proceed under section 1094.5.

The defect, however, cannot be raised for the first time on appeal. As was pointedly stated on analogous facts in *Hoshour* v. *County of Contra Costa* (1962) 203 Cal.App.2d 602, 605 [21 Cal.Rptr. 714]: "[I]f we assume that procedure under section 1094.5 would have been the appropriate remedy, we do not find this point of appellants available to them on appeal because it was not raised at the trial. The parties to an action over which the court has general jurisdiction cannot be heard to claim lack of power to try a particular issue after they have consented to a trial thereof and have participated in the same."

Moreover, conceding that administrative mandamus would have been the appropriate remedy does not mean that review by way of ordinary mandamus, having been pursued without objection to judgment, was precluded as a matter of law. In *Manjares* v. *Newton* (1966) 64 Cal.2d 365 [49 Cal.Rptr. 805, 411 P.2d 901], the Supreme Court held that ordinary mandamus " '. . . will lie to correct abuses of discretion, and will lie to force a particular action by the inferior tribunal or officer, when the law clearly establishes the petitioner's right to such action.' " (At p. 370.)

More importantly, the board cannot point to any prejudice it suffered by reason of the labeling of the proceeding as being under section 1085 rather than section 1094.5. It is conceded that the petition contains all of the elements of an action under section 1094.5. In the context of this case, the only possible material difference between the two proceedings would lie in the different standard of review to be applied by the trial court. The board argues that in a section 1085 proceeding the trial court must uphold the factual determinations of the board so long as its determinations are supported by substantial evidence, whereas in a section 1094.5 proceeding, where the review substantially affects a fundamental vested right of employment of a tenured teacher, the trial court must utilize its independent judgment in evaluating disputed facts. (See *Strumsky* v. *San Diego Employees Retirement Assn.* (1974) 11 Cal.3d 28 [112 Cal.Rptr. 805, 520 P.2d 29]; *Turner* v. *Board of Trustees* (1976) 16 Cal.3d 818, 825 [129 Cal.Rptr. 443, 548 P.2d 1115]; *Bixby* v. *Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242].)

However, since we have concluded that the trial court properly determined that the board abused its discretion, under the substantial evidence test the application of the independent judgment test, which obviously gives the trial court far more latitude in resolving disputed factual questions, could not possibly have led to a different result. Accordingly, the board suffered no prejudice by reason of the mislabeling of the proceeding.

The judgment is affirmed.

Franson, J., and Hopper, J., concurred.