[Civ. No. 62716. Second Dist., Div. Five. June 10, 1982.]

COMPTON COLLEGE FEDERATION OF TEACHERS, LOCAL NO. 3486 AFT, AFL-CIO, Plaintiff and Appellant, v. COMPTON COMMUNITY COLLEGE DISTRICT et al., Defendants and Respondents.

706

COUNSEL

Lawrence Rosenzweig and Levy & Goldman for Plaintiff and Appellant.

O'Melveny & Myers, Richard N. Fisher, Catherine B. Hagen and Kathleen R. Koch-Weser for Defendants and Respondents.

OPINION

LAVINE, J.*—This case involves denial of sick leave pay to certain teachers who were absent December 3 and 4, 1977, the date of an alleged work stoppage or "sick-out" in the Compton Community College District (hereafter District). Appellant Compton College Federation of Teachers, Local 3486 AFT, AFL-CIO (hereinafter Federation) moved the superior court for a peremptory writ of mandate ordering that sick leave be paid by the District to the entire group of teachers absent during December 3 and 4. The superior court denied the Federation's petition for writ of mandate and an appeal was taken.

FACTS

During collective bargaining negotiations between the District and the Federation, agreement had been reached on some issues but other important issues were unresolved. Two of the District's executives overheard statements that teachers would engage in a sick-out on December 3 and 4. On November 30, 1979, the president of the District sent a letter to all faculty members that the District would not allow them to use their sick leave for concerted activities and that:

"All persons absent during a suspected sickout will be denied pay for those days until such time as the administration is satisfied that the absence was unrelated to any concerted activity. Each individual case will be investigated and a determination will be made on its merits."

Fifty-seven of the seventy-nine regular full-time teachers employed by the District failed to report to work on Monday, December 3, 1979, and fifty failed to report on Tuesday, December 4. The average number of teacher absentees for the District in 1979 was five on Mondays and three on Tuesdays.

Mr. Frederick Broder, one of the teachers claiming sick leave pay for his absence on December 3 and 4, spent considerable time on campus on December 3 with a clipboard in his hand, allegedly checking to see which teachers were participating in the sick-out. Mr. Darwin Thorpe, president of the Federation, also claiming sick-pay, was absent from his classes; but was on campus on December 3 speaking to the press. A Federation spokesman informed the television reporters who were on

---

*Assigned by the Chairperson of the Judicial Council.

campus on December 3 that the sick-out had been very successful the first day. The Los Angeles Times reported the sick-out in its December 4 edition and published a quote from the Federation's president that the teachers were expected to return to their normal duties on Wednesday so that instruction would not be seriously impaired.

On December 11, 1979, the District's vice president for academic affairs sent a letter to all teachers who had been absent on December 3 and 4 informing them of the procedure to be used by the District in determining the legitimacy of absences as follows:

"I regret to inform you that the College has determined that no payment shall be made to persons who were absent on these dates [December 3 and 4, 1979] until satisfactory evidence can be obtained that the illness or absence is bona fide. . . .

". . . . . . . . . . . . . . .

"If you wish to pursue your claim for payment, you must contact Certificated Personnel either in person, by telephone, or by letter to submit whatever information you may have in support of your claim. This information must be submitted no later than December 17, 1979."

Forty-seven of the fifty-seven teachers absent on December 3 presented signed statements to the District stating that they had been absent because of illness. Forty-six of these absence reports claimed absence due to personal illness, and one claimed absence due to family illness. The District investigated each claim and, as a result of its ultimate investigation, paid sick leave to one of the 57 teachers absent on December 3, and to four of the teachers absent on December 4.

Board policy 2.034 in effect during all pertinent times, states:

"a. The following may be covered by accumulated sick leave.

"(i) *Personal Illness*—Employees absent for illness will receive full pay for each day accumulated sick leave. Employees may accumulate ten days for each working year. Leaves of absence for illness, verified by a physician, and maternity leaves may be granted upon request. In *general, the statement of the employee will be accepted as evidence of illness or injury.* In the event of absence due to illness or injury lasting more than five consecutive school days, or utilization of sick leave for

more than ten days in a school year, a physician's certificate *may* be requested by the Dean of Instruction (Director of the Evening Division for extended-day employees) or the President of the College. *If any of these officers feels there is reason to question the absence record of a faculty member, he may refer the matter to the Faculty Association Professional Relations Committee for their consideration and advice.*

"(ii) *Illness in the Family.* Absence for illness in the family *shall* be considered personal absence within the limits of Board policy. Sick leave to a maximum of three days per critical illness, not to exceed six days per fiscal year, *shall* be granted for illness in the immediate family as defined in the Education Code, Section 87784...." (Italics added.)

On January 4, 1980, the faculty academic senate requested that the District refer the sick leave pay issue to the professional relations committee (referred to as the PRC) for consideration and advice, and the District agreed to do so. Pursuant to board policy 2.19, a seven-member PRC was appointed, the District being permitted under such board policy to appoint two members and the faculty permitted to appoint five members. The faculty members of the PRC met on February 6, 1980, but the District appointees were not informed of the place or time of this meeting. Those members attending determined to send out a questionnaire to the persons denied sick pay, to obtain some data.

A second meeting was held on February 11, 1980, with all members present. One of the District's appointees moved that the PRC provide information regarding eligibility for sick pay to the persons denied sick pay for December 3 and 4, in order to allow such persons to present their cases to the PRC. Such motion failed. One of the faculty appointees moved that the PRC act on the information provided in the questionnaire without taking any oral testimony. Such motion was seconded and carried. A third meeting was held on February 15 with all members present, and it was reported that 37 out of the 47 teachers claiming sick pay had returned the questionnaires. A District appointee requested that the PRC call each of the 37 teachers to testify, subject to cross-examination, but the faculty members refused. The PRC then voted on the issue of whether the District had violated board policy 2.034, and determined by a vote of four to two (with one abstention) that the District had violated such board policy by its denial of sick pay.

The PRC majority report was furnished to the District on March 21, 1980. The two District appointees to the PRC filed a minority report, reporting the failure of the PRC to allow witnesses to testify, and the failure to follow other procedures set forth in board policy 2.19. The minority recommended that the District should totally disregard the PRC's recommendations because of violation of due process, but went on to recommend that a new administrative hearing be afforded to each of the faculty members claiming sick pay, so that each of such persons should not lose their appeal rights.

Board policy 2.19 (Faculty Grievances—Due Process) provides, among other things, that in case of faculty grievances a fair and impartial hearing will be held, that testimony of witnesses may be presented and sought by either party, and that each party has the right to cross-examine witnesses.

The District's president reviewed the PRC's majority and minority reports, and rendered a decision on March 28, 1980, denying sick leave pay to those teachers who were absent on December 3 and 4 until sufficient verification of illness was presented, and appointed Doctor Jones to establish an administrative hearing procedure for individual cases. No appeal was taken from the District president's decision, pursuant to board policy 2.19 or otherwise.

The District convened an administrative committee to hear individual claims of eligibility for sick pay, and notified all who had been absent that hearings would be held on June 30 and July 2, 1980, to consider any evidence. None of the teachers attended these hearing dates. A makeup hearing date was set, and one teacher attended such hearing on July 10, 1980, and presented evidence. His evidence was considered adequate, and a recommendation was made that he be paid. The District's president accepted such recommendations and the teacher, Mr. Bollinger, was paid. No appeal was taken from the president's determination to adopt the recommendation of the ad hoc hearing officer.

### DISCUSSION

Appellant presents two issues upon appeal from the denial of a peremptory writ of mandate:

1. Did the District violate board policy 2.034 so as to deprive District employees of benefits to which they were entitled?

2. Was the district obligated to follow board policy 2.034 rather than to create and follow an ad hoc procedure?

Respondents contend that petitioner and appellant and the teachers they represent have failed to exhaust their administrative remedies, and thereby may not seek relief in the courts.

It is not necessary for us to decide, and we do not determine, whether or not the teachers had any legal right to engage in the alleged concerted action of the sick-out or whether they had a right to absent themselves from employment by the District on December 3 and 4. We are only called upon to determine whether they had a right to receive pay for these days of absence.

1. ■ Did the District violate board policy 2.034 so as to deprive District employees of benefits to which they were entitled? No.

We encounter at the outset the familiar problem of interpreting permissive words such as "may" contrasted with mandatory words such as "will," "shall" and "must." In *People* v. *Durbin* (1963) 218 Cal.App.2d 846 [32 Cal.Rptr. 569], the court stated at page 849: "The word '*may*' is used and not '*must*,' clearly denoting a discretion on the part of the judge exercising jurisdiction over the proceeding. Government Code section 14 provides:

""'Shall" is mandatory and "may" is permissive.' Section 5 thereof provides: 'Unless the provision or the context otherwise requires, these general provisions, rules of construction, and definitions shall govern the construction of this code.' . . .

"In 27 A. Words and Phrases (permanent ed.) at page 674, it is said:

"'The ordinary meaning of "shall" or "must" is of mandatory effect, while the ordinary meaning of "may" is purely permissive in character.

"'. . . . . . . . . . . . . . .

"'Where neither the clear intent of the Legislature nor public policy requires that the language of a statute shall be given a mandatory construction, the word "may" therein is not equivalent to "must." . . .

"'While word "may" is sometimes construed as equivalent to "must" in statutory construction, such interpretation is proper only where sense of entire enactment requires it or it is necessary to carry out legislative intention.'" (45 Cal.Jur.2d, Statutes, § 157, pp. 658, 659; *California Teachers Assn.* v. *Governing Board* (1977) 70 Cal.App.3d 833, 842 [139 Cal.Rptr. 155)]; *Dept. of Social Welfare* v. *Kern County* (1947) 29 Cal.2d 873, 876 [180 P.2d 1].)

Education Code section 75 provides: "'Shall' is mandatory and 'may' is permissive."

We construe the phrase, "In general, the statement of the employee will be accepted as evidence of illness or injury," to be permissive rather than mandatory in its clear meaning. In this context the word "will" is qualified by the phrase "in general," and hence the word "will" has a permissive rather than a mandatory meaning. If we were to give the word "will" a mandatory meaning by a forced construction, this would render the words "in general" meaningless. It is a principle of statutory construction that strives to give meaning to all of the language in the statute.

█ The word "may" in the phrase ". . . he may refer . . ." contained in board policy 2.034, subdivision i, is clearly permissive. A further indication that the District intended to use "may" in its permissive sense is that elsewhere in board policy 2.034 the District uses the word "shall" in a mandatory sense. For example, in subdivision ii "[a]bsence for illness in the family *shall* be considered personal absence within the limits of Board policy. . . ." (Italics added.) By this the District means that when there is illness in the family (established by criteria set forth elsewhere in board policy 2.034) the teacher shall receive sick leave for that reason to the same extent as he would receive leave for a personal illness.

As for the phrase "consideration and advice," we may consider the first word "consideration" to mean the investigation of the matter by the PRC. In *People* v. *Bright* (1910) 157 Cal. 663 [109 P. 33], the court was called upon to determine the meaning of section 900 of the Penal Code which contains the phrase: "[I]f a challenge to an individual grand juror is allowed, he cannot be present or take part in the *consideration* of a charge against the defendant who interposed the challenge or the deliberations of the grand jury thereon." (Italics added.)

The court stated at page 666: "We are clearly of the opinion that the word 'consideration' in section 900 of the Penal Code means the investigation of the charge."

The Oxford English Dictionary defines "consideration" as: "3. The action of taking into account, or fact of being taken into account.... 4. The taking into account of anything as a motive, or reason, a fact or circumstance taken, or to be taken, into account; a reason considered."

As for the second word in the phrase - "advice," the Oxford English Dictionary provides: "4. Weighing of opinions; consideration, deliberation, consultation, reckoning ... 5. Opinion given or offered as to action; counsel."

Black's Law Dictionary defines "advice" as: "View; opinion; the counsel given by lawyers to their clients; an opinion expressed as to wisdom of future conduct."

The United States Constitution uses "advice" in the following context: (Art. II, § 2, cl. 2) "... He [the President] shall have power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; ..." In this context the word "advice" is the expression of views given to the President by the Senate as contained in their deliberations. The phrase "... and Consent" refers to the formal vote of the Senate to confirm the treaty. Without the phrase "... and Consent" the Senate would only have the right to advise, which carries no power with it.

Government Code section 66415 states: "'Advisory agency' means a designated official or an official body charged with the duty of making investigations and reports on the design and improvement ...."

The phrase "... he may refer the matter ... for their consideration and advice ..." is clear. It means that if any of the designated officers chooses to do so, he may (but need not) refer the matter to the PRC. If he chooses to refer the matter to the PRC, there is no delegation of authority or abandonment of power by the referring officer. All that the PRC does is to investigate the matter and report back to the referring officer. The PRC has then taken the matter for their "... consideration and advice," and their duties and power are thereupon discharged. The referring officer can accept their advice, reject it, or take some other course, as he may choose.

The reasons for this construction include:

a. The plain meaning of the words permits only this construction;

b. The word "may" is used in its ordinary sense of being permissive; and the words "consideration" and "advice" when used in their ordinary meaning involve only an advisory role for the PRC.

c. Since the referring officer did not have to refer the matter to PRC, the act of referral is only for the purpose of "consideration and advice," without the referring officer having lost any power he possessed before the referral.

If the referral were to be construed as a delegation of authority to the PRC without the retained power of overriding their advice, such delegation would be ultra vires.

Education Code section 72230 states: "Every community college district shall be under the control of a board of trustees." Section 72231 states: "The governing board of each community college district shall prescribe and enforce rules not inconsistent with law or with the rules prescribed by the board of governors, for its own government." Section 87781.5 authorizes use of sick leave "in cases of compelling personal importance." Section 87784 also authorizes use of sick leave "in cases of personal necessity."

If the District or its officers were to delegate to PRC or any other body the power to determine finally whether a teacher or group of teachers had satisfied requirements as to whether the teacher (or his or her relative) was actually sick, this would be a delegation ultra vires. (In *Renken* v. *Compton City School Dist.* (1962) 207 Cal.App.2d 106 [24 Cal.Rptr. 347], the court struck down a resolution of the District which declined to make deduction of union dues under certain circumstances. The court said at page 114: "A governing board of a school district has no authority to enact a rule or regulation which alters or enlarges the terms of a legislative enactment."

By analogy a board of directors of a private corporate cannot delegate away its responsibility to govern the corporation, unless permitted to do so by statute. (*Smith* v. *California Thorn Cordage, Inc.* (1933) 129 Cal.App. 93, 98-99 [18 P.2d 393].) The Legislature can grant this power to delegate, as it has done, by allowing powers to be delegated to

committees of the board of directors, i.e., Corporations Code, sections 212, subdivision (b)(5), and 311.

Hence the District did not violate board policy 2.034 by any of its actions.

2. ■ Was the District obligated to follow board policy 2.034 rather than to create and follow an ad hoc procedure?

In light of our determination that the District did not violate board policy 2.034 by its actions, this question could be disposed of by giving a negative answer. However, a more liberal construction of 2.034 may be that by referral of a grievance to the PRC the procedure set forth in board policy 2.19 would come into effect. The president of the District chose to refuse to follow the majority report and to adopt the minority dissenting report. This he had the power and right to do under either 2.034 or 2.19. Paragraph 8 of 2.19 provides: "The Committee shall report its recommendations to the President of the College, who shall inform all affected parties of his decision within 5 school days."

The president chose to reject the majority report in part because of the majority's violation of the due process requirements of 2.19 itself, which provides for the taking of testimony and right of cross-examination at the request of any party. Even if these requirements were not a part of 2.19, principles of administrative due process would have so required in this type of administrative hearing. When the president rejected the majority report, he still desired to give due process to those faculty members who might be able to establish that they had a right to sick pay by affording them an opportunity to present evidence for administrative determination. The president set up an ad hoc procedure for the conduct of a hearing upon notice to all affected, with the opportunity to present evidence. Those who did present evidence were determined to have established their right to sick pay, and this recommendation was followed and carried into effect by the president of the District.

Since procedural due process was afforded those confirmed, the appellants have no cause to complain in this appeal. Neither the District nor its officers acted in an arbitrary or capricious fashion. The District and its officers had reason to believe that a concerted effort for a sick-out would take place on December 3 and 4, and it did. All of the faculty members were given notice that if they did not report for work

on those dates, the usual policy of permitting the statement of the employee to be accepted as evidence of illness would *not* be accepted.

The Board and its officers were acting in accordance with their statutory duties in taking this approach to a sick-out. The board has a fiduciary duty to the State of California and its citizens that public monies be expended only for the purposes prescribed by the Legislature. If persons were to receive public monies they had not earned, the failure to monitor disbursal of public funds would be a dereliction of duty by the District's officers. Board policy 2.034 which *in general* permits certifications to suffice is, under ordinary circumstances, a rule of reason so as not to impose burdensome requirements upon a person who is ill for only several days. In an ordinary illness of several days, the employee usually will not be seen by a physician, so it would be burdensome to require a physician's certificate. This rule of reason cannot be applied to a sick-out, because the reason for the waiver of the requirement of a physician's certificate (or the furnishing of more concrete evidence of illness) no longer exists.

The District and its officers were acting entirely according to law and due process in following an ad hoc procedure in ascertaining whether there was a basis for sick leave on the part of those employees who were absent on December 3 and 4.

In view of the above, it is not necessary to determine whether the appellant was compelled to or had exhausted its administrative remedies.

The judgment below is affirmed.

Ashby, Acting P. J., and Hastings, J., concurred.