Filed 4/11/25 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| SARAH ANN MILES, | C099438 |
| Plaintiff and Appellant, | (Super. Ct. No. 21FL02359) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |
| JEFFREY GERSTEIN, | |
| Defendant and Respondent. | |

THE COURT:

It is ordered that the opinion in the above-entitled matter filed on March 28, 2025, be modified as follows:

1. Change the spelling of Respondent's last name in the caption from 'Gernstein' to 'Gerstein.'

2. Modify the sentence on page 6 that says, "Gerstein paid Miles approximately $28,000 total during and shortly after pregnancy" to read:

1

"Gerstein paid a total of $28,000 to the mother and others during and shortly after pregnancy, including amounts paid for pregnancy-related expenses, money to Miles for lost income, and $5,000 for Miles to take a trip to Europe."

There is no change in the judgment.

The petition is otherwise denied.

BY THE COURT:

_____
HULL, Acting P. J.

_____
MAURO, J.

_____
BOULWARE EURIE, J.

Filed 3/28/25 (unmodified version)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| SARAH ANN MILES, | C099438 |
| Plaintiff and Appellant, | (Super. Ct. No. 21FL02359) |
| v. | |
| JEFFREY GERNSTEIN, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Bunmi O. Awoniyi, Judge. Affirmed.

Law Office of Stephanie J. Finelli and Stephanie J. Finelli for Plaintiff and Appellant.

Shannon Minter for National Center for Lesbian Rights and Men Having Babies as Amici Curiae on behalf of Plaintiff and Appellant.

Jarrette & Walmsley, Robert R. Walmsley and Marlea F. Jarrette for Defendant and Respondent.

1

Appellant Sarah Ann Miles appeals from a judgment that found (1) an oral traditional surrogacy agreement that she entered into with respondent Jeffrey Gerstein controls the relationship between her and the child born following that agreement; and (2) she is not a parent to the child under that agreement.

Both parties performed under the terms of the agreement until the child was seven years old. In those seven years, Gerstein, whose sperm was used to conceive the child, acted as the child's sole parent. In this decision, a "traditional surrogacy" is an arrangement where a woman conceives (1) without sexual intercourse; (2) using her ova; (3) using the sperm of the intended legal father or sperm arranged by the intended legal parents; and (4) with the mutual intention that she will not be a legal parent of the child. Traditional surrogacy contrasts with "gestational surrogacy," where the woman who gestates the child does not use her ova and, therefore, has no genetic relationship to the child. We find under the facts of this case the oral agreement is enforceable and affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

Based on the testimony in the trial court and the trial court's unchallenged credibility determinations, the facts are as follows:

### Formation of the Agreement

Gerstein is a single gay man and Miles is a single lesbian.

Miles and Gerstein met in 2002 or 2003 when Miles and her daughter, Madeleine, moved next door to Gerstein. Thereafter Miles and Gerstein became friends.

Gerstein began thinking about becoming a parent while he was in his teens and in 2010, he began to explore his options in that regard in earnest. He spoke with gay people with children to see how they became parents, he bought books regarding surrogacy and adoption, he spoke with an adoption agency, and he spoke with lawyers and physicians after which Gerstein decided to pursue a surrogacy.

Gerstein told Miles he was researching ways to become a parent and, in early 2012, Miles offered to be a surrogate for Gerstein.

Throughout 2012, Gerstein and Miles discussed the prospect of her being his surrogate. Gerstein wanted to use a separate ova donor, but Miles was not receptive to that. According to Gerstein, Miles did not want hormone treatments. Initially, Gerstein was concerned about Miles using her own ova, but, given his trust in Miles and her reassurances she did not want to be a mother to the child, Gerstein went forward with Miles using her ova. Specifically, Gerstein testified: " . . . [s]o I was given all—you know, the reassurance, and I felt that I could trust what she said, which was that she did not want to be a mom. She did not want to be, you know, a mom to another child. She had a—she had a child, at that time, and she was—you know, did not want to repeat that process yet again."

Miles and Gerstein reached a final agreement in November 2012. Gerstein would be responsible for all pregnancy-related expenses up to six months post-delivery. They agreed if there were significant complications with the developing baby, Miles would terminate the pregnancy. They agreed Miles would take supplements, avoid teratogenic medications, and limit her alcohol and marijuana use while pregnant.

The parties agreed that soon after the baby was born it would live with Gerstein permanently. They agreed Miles would initially breastfeed the child then move to pumping.

The parties agreed Gerstein would be the sole parent to the child, and Miles would not be the child's mother.

Again, Gerstein testified that, specifically: "The terms or the agreement that we came to was that—first and foremost—was that I was going to be the parent to—to the child; that Ms. Miles was not going to be Mom to the child. I was going to be a single parent. That—and all the things that went into that. All the decision-making.

3

"I mean, I could list it.  But we very specifically, you know, came up with the various avenues of decision-making that one makes as a parent, but that I was going to be the sole parent, make all decisions for—for the child, child would live with me, as—as I was going to be the—the—a single parent to—to the child."

As a sole parent, Gerstein was to be responsible for all decision-making regarding how the child was raised including decisions regarding the child's medical care and education and Gerstein was to assume all financial responsibility for the child.

According to Gerstein, he and Miles agreed the child would call Miles "Sarah," not "Mom."

Gerstein anticipated there would be some contact between Miles and the child after it was born.  They were neighbors, and when they interacted as friends the child might be present.  He expected Miles might join in celebrations like birthdays as a friend.  But, according to Gerstein, it was understood that invitations would be at his discretion, and Miles would defer to him regarding the amount of contact she had with the child.  At trial, Miles acknowledged the parties did not make a specific agreement regarding what her contact with the child would look like.

The parties agreed to remain transparent with the child regarding how it was conceived.

Gerstein did not enter a written contract with Miles because he had no reason to think she would not honor her agreement, and "this wasn't . . . a business transaction."  It was an agreement with a close friend about a child.  According to Gerstein, at one point Miles said she wanted an agreement to ensure Gerstein would not give the baby back to her.

Pregnancy, Birth, and Infancy

Miles and Gerstein began trying to conceive in January 2013.  When Miles determined she was most fertile, she would tell Gerstein and Gerstein would then provide

4

Miles a sperm specimen which Miles used to inseminate herself. Gerstein is a doctor of psychiatry and Miles is a registered nurse who spent approximately six years working as a birthing doula, but the parties did not use the services of other medical professionals to achieve conception. After a few tries, Miles became pregnant.

Gerstein paid Miles approximately $28,000 total during and shortly after the pregnancy.

Multiple witnesses testified Miles referred to herself as a surrogate for Gerstein before and while she was pregnant. They testified Miles said she had already raised her child and had no interest in being a parent to the child she was carrying for Gerstein. They testified about a baby shower where Miles was in attendance, but the guests were Gerstein's friends and family, and the gifts were for him. One friend testified that Miles offered to serve as a surrogate for him and his partner too.

In December 2013, Miles gave birth to a baby girl at home using a midwife who Gerstein paid. Gerstein was in the room when the child, E., was born.

Miles is identified as E.'s mother on E.'s birth certificate. According to Gerstein, though the parties agreed Miles would not be recognized as or assume the role of E.'s mother, Miles asked to be named on the birth certificate to prevent the line for "mother" being blank. Although Gerstein was not comfortable with this, he agreed it might matter to E. someday and agreed to it. Gerstein signed the birth certificate.

Gerstein and E., stayed at Miles's home for five to six days after E.'s birth so Miles could breastfeed E., as the parties had agreed. After those first days, E. never spent the night at Miles's home again.

After one to two weeks, Miles began reducing her breastfeeding and would pump her breasts. Gerstein used the pumped milk to feed E. and then transitioned to using formula. Gerstein paid to rent the breast pump.

In E.'s early days, Gerstein's mother would help care for E. and sometimes spent the night.  Gerstein also arranged for the services of a nanny within six-months of E.'s birth.

Miles stopped providing breast milk in March 2014 around the time Miles left for a two to five week trip to Europe  Pursuant to an agreement between the parties, Gerstein paid $5,000 towards Miles's European trip.

When E. was a baby, Gerstein and his mother hosted a naming ceremony.  Miles and Madeleine attended.  Gerstein's mother arranged the prayer book for the ceremony and the book thanked Miles for helping bring E. into the world.  It included prayers for grandparents and the father to say.  There were no prayers for a mother, because according to Gerstein's mother "there was no mother."  Miles was never invited to Jewish holidays with E.'s family.

Relationship Post Birth

Gerstein testified that from 2014 through 2019, the parties would sometimes have dinner together and E. might join them, or they might go get ice cream together.

Along with other close friends, Miles and Madeleine attended some of E.'s birthday parties.  Miles never helped to set up or pay for those parties.

According to Gerstein, a couple of times when Gerstein's mother and the nanny were not available, Miles watched E. for a few hours.  Miles described the times in which E. would visit her in her home as more frequent.

E. participated in a variety of extracurricular activities.  Gerstein arranged all the activities, took E. to practices, and watched performances and competitions.  Except for attending one theater camp performance and having her use of Gerstein's pool overlap a bit with one of E.'s swim lessons, Miles never participated in or observed these activities.  She has never asked to.  Gerstein's mother, other family friends, and E.'s nanny have

6

attended some of E.'s soccer games. When E. was very young, Gerstein would attend "mommy and me" classes with her and take on the "mommy" role.

Miles, Gerstein, and E. did not spend holidays together, though they all sometimes attended the 4th of July party of a common friend.

Without Miles's participation, Gerstein enrolled E. in the schools she has attended and at those schools Miles has not been identified as a parent. Miles has never participated in any events at the schools while Gerstein volunteered at E.'s school.

Miles has never participated in selecting physicians or dentists for E. and has never participated in medical treatments E. has received. Miles has not been identified as E.'s mother when arranging for E.'s doctors and dentists. Gerstein only has been involved in arranging for E.'s medical needs.

Miles signed E.'s passport application.

Miles admitted she has never been financially responsible for E.

According to Gerstein, E. has never referred to Madeleine as her sister. Gerstein characterized Madeleine's interactions with E. as largely "incidental." Madeleine attended some of E.'s birthday parties, visited with E. a couple of times at Gerstein's home, showed E. where she lived at college and had dinner with Gerstein and E. when they visited Berkeley.

E. refers to Miles as "Sarah" and has never called Miles "Mom."

Witnesses testified that Miles does not act like a mother or act differently than any other friend around E. If E. needs someone to take on parental duties, Gerstein does that.

Miles could not recall E.'s earliest words.

At trial, Gerstein presented art and school projects E. has made in which she identifies family and people she feels close to. Miles is not identified in those projects. E. prepared a 2020 Thanksgiving project where E. listed members of her family; Miles does not appear thereon. Gerstein also identified a journal Miles gave E., in which Miles wrote in the front cover, "Happy 7th Birthday, [E.] Love, Sarah."

7

Gerstein made a book for E. that includes pictures of Miles when she was pregnant. When E. was in pre-school, she wanted to know who her mom was when she saw other children's moms. Gerstein told E. that he had wanted to have a baby, and Miles was E.'s surrogate and gave birth to E. He told E. half her genetics come from Miles. Gerstein explained to E. that she does not have a mom, but a daddy, a grandma, and an uncle. He wanted to both be transparent and maintain boundaries regarding Miles. E. understood Miles acted as a surrogate, or, when E. was younger, as a "birth friend." Gerstein told E. a mommy is someone who takes care of you on a day-to-day basis, which Miles doesn't do, which is why they called her by her first name. At trial, Miles admitted she deferred to Gerstein as to when and how to describe E.'s conception and birth to her, and whether Miles would participate in that conversation.

At trial, Gerstein read a text sent from Miles in December 2017 in which Miles wrote, "[l]et's talk more about this . . . so we're on the same page and things are clear[.] I'm glad you have that lezzie couple to resource, and I do think it is a vastly different experience being a sperm donor versus a *biological surrogate*. Some questions, as they relate to my body and process as a woman, are going to be a part of the conversation, and I want to make sure both of our needs and expectations are considered. I don't intend to step on your toes and I get that you want to be the one to answer the developmental questions [E.] will have. That's understandable. It is important to me that simple truths . . . aren't made into secrets or have some hidden strangeness around them. If we are honest, I don't think it's complicated." (Italics added.)

Gerstein's brother testified that after E. was born, Miles told him she was happy the surrogacy had been successful.

According to Gerstein, E. has told people dozens of times that she has a surrogate who is her neighbor, because her daddy can't have a baby and the surrogate helped him have a baby. E. tells people she does not have a mom.

The court reviewed a text message from Miles sent to Gerstein on February 10, 2018. In the text, Miles mentioned that when she told Gerstein about visiting a therapist, he had suggested she might be going because she wanted to parent E. She wrote, "now that's where your mind went, tells me that we can't be more opposite thinking. . . . [Y]ou thought that, which is the farthest from my mind."

The parties' relationship deteriorated in 2020, during the COVID pandemic. Gerstein restricted his interactions with everyone who was not immediate family.

According to Gerstein, in 2020 Miles would ask to come over to hug E., something she had never done before. Miles began to insist on being given the option to spend more time with E. in person. Miles's job as an emergency room nurse and Gerstein's belief that she would not receive the COVID vaccine when it was first available contributed to his unwillingness to grant these requests. Miles began to claim that Gerstein was not honoring their agreement.

In February 2021, Miles expressed interest in meeting with a custody mediator. In March 2021, when Gerstein offered to let Miles spend time with E. outside with a mask on, Miles said she would prefer her time with E. to be one-on-one.

On May 19, 2021, Miles wrote Gerstein saying it was important that she see E., and expressing concern that he was rewriting the narrative regarding what she believed was their agreement as to E.

In May 20 and May 21, 2021 e-mails, Miles said her relationship with E. was not optional, and they had agreed to that contact. Gerstein wrote that E. was not Miles's child, and Miles was a surrogate. Miles disagreed, insisting she was E.'s mother and telling Gerstein he could not refer to her as a surrogate. She said that the trust between them had broken down and that she felt his actions were harmful to E., her, and Madeleine.

9

Pretrial Proceedings

In May 2021, when E. was seven years old, Miles filed a petition to determine her parental relationship with E. She asked the court to decide that she and Gerstein both have a parent-child relationship with E. She asked for joint legal and physical custody of E. and visitation. Miles also filed a request for an order (RFO) for joint legal and physical custody, child support, and visitation. Miles argued she is E.'s parent, under Family Code section 7610, by virtue of giving birth to E. and their genetic relationship. (Statutory section citations that follow are to the Family Code unless otherwise stated.)

Gerstein filed a response to the RFO in June 2021, stating he did not consent to the request for custody and asking the court to deny the requests for custody and visitation. He filed a request for an evidentiary hearing before the court made any custody determinations.

In July 2021, Gerstein filed a response to Miles's petition and requested the court find Miles has no parental rights. Gerstein also filed a petition to terminate Miles's parental rights if the trial court found Miles was E.'s mother.

The court granted Gerstein's request for an evidentiary hearing. The trial court decided to determine Miles's parental status before making orders regarding visitation.

Gerstein agreed to stay the proceedings on his request to terminate Miles's parental rights pending adjudication of the surrogacy issue.

Trial

Trial took place in March and April of 2023. Gerstein's witnesses testified first, then Miles testified.

After Miles testified, the court met with counsel. The trial court said it believed it had received enough evidence to make a decision and asked counsel if they were willing

10

to submit on the evidence presented up to that point, or if they wanted to proceed with further submission of evidence.  The trial court told the parties they could put their cases on "to the end" as they saw fit.  The court made this offer because there had been discussion about whether the court could meet and confer with the parties to see if they could come to a resolution without the court making a final determination on the merits.  The trial court did not initially agree to this because, as the judge assigned to decide the case, the judge wanted to make sure it heard enough evidence to make up its mind and make a ruling before meeting with the parties.

Both parties submitted on the evidence.  The court then held meetings with the parties but the parties did not reach an agreement.  Counsel gave closing arguments.

<u>Ruling</u> <u>and</u> <u>Post</u> <u>Trial</u> <u>Proceedings</u>

On July 5, 2023, the trial court issued a final ruling and order.  The court found under clear and convincing evidence that Gerstein and Miles entered a valid contract for a traditional surrogacy that governed their relationship.  It found the intended result of the agreement was the birth of a child concerning whom Gerstein would have sole parental rights.

The trial court decided that the evidence supported a finding that at the time of contracting, Miles and Gerstein agreed that Miles would supply her ova to give a child to Gerstein, the child would be raised by Gerstein, and Miles would "not be involved in the financial support or day to day child rearing responsibilities.  While [Miles] disputes the label 'surrogate' and whether that term was part of their initial discussions and agreement, the evidence establishes that this was indeed the arrangement the two made and that this was the intent of the agreement."  The court also found the "conduct of the parties after [E.'s] birth and for the better part of seven to eight years supports the conclusion that such an agreement existed, despite the fact it was never memorialized in writing."

11

In explaining the court's decision, the trial court stated it relied on the testimony *of both parties* which established their agreement and which included the following terms:

"[Miles] would provide her genetic material, use [Gerstein's] sperm to become pregnant, and birth a child.

"[Gerstein] would pay [Miles] for all pregnancy-related expenses, including but not limited to pre-pregnancy testing and materials, medical visits, maternity clothes, pre- and post-birth midwife costs, lost income, lost retirement benefits, and post-pregnancy needs.

"[Gerstein] would pay for [Miles] to take a trip to Europe, to occur shortly after the child's birth.

"The child would breast-feed with [Miles] for a very short time and then would rely on pumped breast milk provided by [Miles].

"[Gerstein] alone would be responsible for and make decisions as to the child's physical, emotional, medical, psychological, educational[,] financial, and religious needs.  The [trial court] acknowledge[d] [Miles's] vague reference to being a future participant in [E.'s] 'emotional well-being' but [found] it also lack[ed] credibility and definition sufficient to be considered.

"[E.] would not refer to [Miles] as her mother."

The trial court found the evidence did not support a finding that Miles was the presumed parent of E. under section 7611.

The trial court also found it would not be in E.'s best interest for Miles to enter E.'s life in the role of a parent.

Judgment was entered on July 10, 2023.  Miles brought a motion for a new trial, which the trial court denied.

Miles filed this appeal.

DISCUSSION

I

*Scope and Standard of Review*

Contracts require, "1. Parties capable of contracting; [¶] 2. Their consent; [¶] 3. A lawful object; and, [¶] 4. A sufficient cause or consideration." (Civ. Code, § 1550.) An express contract exists when its terms are stated in words. (Civ. Code, § 1620.) "An implied contract is one, the existence and terms of which are manifested by conduct." (Civ. Code, § 1621.) Contracts may be oral unless they "are specially required by statute to be in writing." (Civ. Code, § 1622.)

In her reply, Miles identifies what is and is not at issue in this appeal as follows: "the substantial evidence standard [has no] place in this Court's review. [Miles]'s appeal assumed, for purposes of the arguments therein, that the [trial] court had found an oral surrogacy agreement. [Fn. Omitted.] The only questions before this Court on appeal are whether California law recognizes an oral surrogacy agreement or whether, as [Miles] contends, any such purported oral genetic surrogacy agreements conflict with controlling California statutes and case law, and whether [Miles] is a legal parent under the plain terms of the [Uniform Parentage Act (UPA)]. [Citation.] This appeal does not require or seek review of the trial court's credibility determination." In her opening brief, Miles suggests that a traditional surrogacy agreement, standing alone, cannot serve to divest a surrogate of a parent and child relationship. Thus, we construe Miles's position to be that the surrogacy agreement cannot be enforced because (1) surrogacy contracts cannot be oral, and therefore the parties' agreement was not an enforceable contract as contemplated by Civil Code section 1622; and (2) the agreement did not have a lawful object, and therefore did not satisfy Civil Code section 1550's requirements for the existence of an enforceable contract. Miles and amici curiae also make various

13

arguments asserting constitutional law issues and argue that public policy favors her position.

We interpret judicial opinions and statutes under de novo review. (*Tufeld Corp. v. Beverly Hills Gateway, L.P.* (2022) 86 Cal.App.5th 12, 20 [statutes reviewed de novo]; *Martinez v. Rite Aid Corp.* (2021) 63 Cal.App.5th 958, 969 [opinions reviewed de novo].)

II

*The Law Does Not Require that a Traditional Surrogacy Contract Be in Writing*

Miles argues that section 7960 governs surrogacy agreements and requires all surrogacy agreements—for both traditional and gestational surrogacies—be written. By extension, she reasons because her agreement with Gerstein was not in writing no surrogacy relationship was formed. Gerstein argues that this interpretation is strained and contrary to the rules of statutory construction. We agree with Gerstein.

" ' "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose." ' (*Carson Citizens for Reform v. Kawagoe* (2009) 178 Cal.App.4th 357, 366 []; see *Fluor Corp. v. Superior Court* (2015) 61 Cal.4th 1175, 1198 [].) ' " 'We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.' [Citations.] The plain meaning controls if there is no ambiguity in the statutory language. [Citation.] If, however, 'the statutory language may reasonably be given more than one interpretation, " ' "courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." ' " ' " ' (*Fluor Corp.*, *supra*, at p. 1198.)" (*Center for Biological Diversity v. Department of Conservation, etc.* (2019) 36 Cal.App.5th 210, 231-232.)

14

Section 7960 contains various definitions "[f]or purposes *of this part*," which is Part 7 of Division 12 of the Family Code (Part 7). (Italics added.) Section 7960, subdivision (f), defines "Surrogate" as "a woman who bears and carries a child for another through medically assisted reproduction and pursuant to a written agreement, as set forth in Sections 7606 and 7962." Subdivision (f) also recognizes that "[w]ithin the definition of surrogate are two different and distinct types." The first type is a " '[t]raditional surrogate' " who is "a woman who agrees to gestate an embryo, in which the woman is the gamete donor and the embryo was created using the sperm of the intended father or a donor arranged by the intended parent or parents." (*Id.* at subd. (f)(1).) The second type is a " '[g]estational carrier' " who is "a woman who is not an intended parent and who agrees to gestate a genetically unrelated embryo pursuant to an assisted reproduction agreement." (*Id.* at subd. (f)(2).)

When the Legislature enacted Part 7 in 2010, Part 7 only contained sections 7960 and 7961, and it did not include the definition of "surrogate" Miles heavily relies on in her briefing. (See Stats. 2010, ch. 138, § 1.) Section 7961 governs the handling of client funds by nonattorney surrogacy facilitators.

The term "surrogacy facilitator" refers to a person or organization that advertises to solicit parties to or otherwise charges a fee to provide services related to "an assisted reproduction agreement." (§ 7960, subd. (e).) "Assisted reproduction agreement" is defined as having the same meaning as it does in section 7606, subdivision (b). (§ 7960, subd. (a).) In turn, section 7606, subdivision (b), defines an assisted reproduction agreement as "a written contract that includes a person who intends to be the legal parent of a child or children born through assisted reproduction and that defines the terms of the relationship between the parties to the contract." These aspects of these definitions were in place in 2013. (See §§ 7606, subd. (b) (2013); 7960, subd. (e) (2013).)

15

In 2012, with a bill chaptered on September 23, 2012, the Legislature added to Part 7 section 7962 and the definition of "surrogate" in section 7960. (See Stats. 2012, ch. 466, §§ 2-3.)

Section 7962 as enacted in 2012, as currently written, details requirements for agreements for gestational carriers, allows an action to establish a parent-child relationship for a child conceived pursuant to an assisted reproduction agreement for gestational carriers to be filed before the child's birth, and provides that an assisted reproduction agreement for gestational carriers executed in accordance with the section is presumptively valid. (§ 7962, subds. (a)-(g), (i) (2013 & 2024).)

When the Legislature amended Part 7 in 2012, it also amended the heading of Part 7. (See Stats. 2012, ch. 466, § 1.) The Legislature specified the heading would read, "SURROGACY FACILITATORS AND ASSISTED REPRODUCTION AGREEMENTS FOR GESTATIONAL CARRIERS." (*Ibid.*)[1]

Miles argues that because the definition of surrogate in section 7960 specifies a surrogate is someone who bears a child through medically assisted reproduction "and pursuant to a written agreement" (subd. (f)), "all" surrogacy agreements must be in writing and the parties to the agreement must engage the services of medical professionals. But the plain language of the statute does not say that. The statute defines surrogacy "*for purposes of this part*," which is Part 7. (§ 7960.) Part 7, in turn, only contains statutes that govern how nonlawyer surrogacy (and donor) facilitators manage client funds, and the requisite contents of *gestational* carrier agreements which carry a specified weight in actions to establish a parent child relationship. (§§ 7961-7962.) Likewise, with respect to surrogacy and surrogates, the heading of Part 7 reflects that "this part" contains provisions that govern surrogacy facilitators and assisted

---

[1] The current heading to the statute has been amended to reflect subsequent the extension of Part 7 to cover facilitators of donors including oocyte donations.

16

reproduction agreements for gestational carriers. Read in this context, the plain language of section 7960 does not require that *all* surrogacy agreements must be in writing to be enforceable.

To interpret section 7960 to require *all* surrogacy agreements to be in writing to be enforceable this court would need to treat the "for purposes of this part" language as surplusage. This we will not do. (*Klajic v. Castaic Lake Water Agency* (2001) 90 Cal.App.4th 987, 997.)

The reference to section 7606 in section 7960, subdivision (f)'s, definition of surrogate does not help Miles. The definition provided applies for purposes of Part 7, Part 7 does not purport to govern or define all surrogacy agreements in all contexts, and here we are not concerned with a surrogacy agreement that used a facilitator or was for a gestational carrier.

Miles argues the heading of Part 7 is not part of the statutory scheme and simply reflects the arrangement by the editor of the code. To make this argument, Miles misreads the most recent case she cites to support the argument. According to *Shiheiber v. JPMorgan Chase Bank, N.A.* (2022) 81 Cal.App.5th 688, 696, "[i]t has long been the law in California that headings that simply reflect 'merely the arrangement, by the editor of the code . . . are no part of the act as adopted by the [L]egislature which a reading thereof will reveal' and that the *headings of parts of the code are only treated as part of the law if 'such heading is a part of the section at the time of its adoption as the law of the state.'* " (Italics added.) Here, when the Legislature adopted section 7960, subdivision (f), it also adopted the heading language of Part 7 that supports a finding that Part 7's definition of surrogate applies in the limited context of statutes that govern "surrogacy facilitators and assisted reproduction agreements for gestational carriers." (See Stats. 2012, ch. 466, § 1, all caps removed.)

Section 7606 also does not create a statutory mandate that traditional surrogacy agreements be in writing. Similar to the framing language of section 7960, section 7606

17

states that its definitions apply, "[a]s used in this part," which is the Uniform Parentage Act (UPA). (See § 7600.) Then, in the rest of the UPA, the term "assisted reproduction agreement" is used primarily to determine when and where actions can be filed to determine the parentage of children conceived under those agreements. (See, e.g, §§ 7620, 7630, subd. (f).) None of this creates a mandate that all surrogacy agreements be written to be enforceable.

Miles points to language in section 7613, subdivisions (a) and (b)(2), to argue that if an oral agreement could suffice to form an enforceable surrogacy agreement, the Legislature would have adopted a statute saying as much. We are not persuaded by her argument. Section 7613, subdivision (a)(1), provides that when a woman, with the consent of another intended parent, conceives a child using a donor of sperm or ova who is not her spouse, (1) the child's other intended parent will be treated as the child's natural parent; and (2) the other intended parent and woman who becomes pregnant shall consent in writing. Section 7613, subdivision (b)(2)(A), provides that when someone donates sperm for use by a woman who is not his spouse without going through a licensed physician or sperm bank, the donor will not be the natural father of the child conceived if the donor and woman sign a written agreement to that effect prior to conception. In the absence of a written agreement, both subdivisions provide the subject conclusion regarding parentage can be demonstrated based on clear and convincing evidence of an oral agreement. (§ 7613, subds. (a)(2) & (b)(2)(B).) These statutes demonstrate that the Legislature can and has (1) required written agreements to show intent in some assisted reproduction scenarios; and (2) established evidentiary burdens to meet when an oral agreement will suffice in those scenarios. But these statutes do not say that all oral agreements regarding assisted reproduction that the Legislature has not yet addressed are unenforceable, no matter how compelling the evidence that the agreement exists and was executed by the parties. Civil Code section 1622 says, "[a]ll contracts may be oral, except such as are *specially required* by statute to be in writing." (Civ. Code, § 1622,

18

italics added.)  It does not say, "all contracts must be in writing unless a statute specifically allows it to be oral."

Because the plain language of the statutes Miles cites do not support her position, we need not delve into the legislative history of sections 7606, 7960, or 7962.  However, a review of the Legislative Counsel's Digest accompanying the adoption of each of the sections supports a conclusion that those sections do not mandate *all* surrogacy agreements be in writing to be enforceable.  (See Leg. Counsel's Dig., Sen. Bill No. 1325 (2005-2006 Reg. Sess.) ["This bill would . . . require a person who causes conception through assisted reproduction in this state to submit to the jurisdiction of the courts of this state"]; Leg. Counsel's Dig., Assem. Bill No. 2426 (2009-2010 Reg. Sess.) [Stating Part 7 would regulate the practice of surrogacy facilitators, as defined, and would require a nonattorney surrogacy facilitator to direct his or her client to deposit client funds in an independent, bonded escrow account or a trust account maintained by an attorney, subject to specified withdrawal requirements]; Leg. Counsel's Dig., Assem. Bill No. 1217 (2011-2012 Reg. Sess.) [revealing that in amending Part 7 in 2012, the Legislature was concerned with the entry and contents of "assisted reproduction agreements for gestational carriers"]; see also *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 31, 35 [identifying Legislative Counsel's Digests as cognizable legislative history sources in this court].)

In short, we agree with the well-reasoned findings of the trial court regarding what these statutes have to say about traditional surrogacy:  "The legislative framework does not sufficiently cover agreements pertaining to traditional surrogacy.  [An] examination of the legislative intent pertaining to surrogacy agreements reveals only that the Legislature was concerned with gestational surrogacy agreements and their contents. . . . There is nothing in the stated intent of [the bill adopting the definition of surrogate and section 7962] pertaining to any sort of traditional surrogacy [agreement], let alone the content thereof, or that such an agreement be in writing."  Though we recognize—and the

19

trial court recognized—that section 7960, subdivision (f), contains language regarding what a traditional surrogacy is for purposes of Part 7, the language of Part 7 governing the content and mode of entering a surrogacy agreement only addresses gestational surrogacy. "Accordingly . . . the statutory language supports the conclusions . . . that traditional surrogacy agreements are not required to be in writing."

This conclusion is supported by *In re Marriage of Buzzanca* (1998) 61 Cal.App.4th 1410 (*Buzzanca*). In *Buzzanca* a husband and wife had an embryo that was not genetically related to them implanted into the uterus of a surrogate who also was not genetically related to the embryo. (*Id.* at p. 1412.) After the surrogate became pregnant, the husband and wife "split up." (*Ibid.*) The husband disclaimed any responsibility for the child, and the surrogate made it clear she made no claim to the child. (*Ibid.*) The trial court concluded the child had no parents. (*Ibid.*) The court of appeal reversed, concluding both the husband and wife were legal parents of the child. (*Id.* at p. 1413.) In attempting to avoid a finding of parentage, the husband argued that when implantation of the embryo took place, " 'no surrogacy contract had been executed by the parties to [the] action.' " (*Id.* at p. 1414.) The court was unpersuaded. (*Ibid.*) It wrote, "[c]oncerned with the implication made in [husband's] brief, members of this court questioned [his] attorney at oral argument about it. It turned out that the intimation in [his] brief was a red herring, based merely on the fact that [he] did not sign a written contract until after implantation. [The child] was nonetheless born as a result of a surrogacy agreement on the part of both [wife] and [husband]; it was just that the agreement was an oral one prior to implantation. The written surrogacy agreement . . . was the written memorialization of that oral contract." (*Ibid.*)

Miles unsuccessfully tries to distinguish *Buzzanca* by noting that in *Buzzanca* the oral contract was followed by the memorialization of that contract in a written agreement, where here there was never a written agreement. Even if we were to agree that *Buzzanca* suggests something more than evidence the parties reached an oral agreement is needed

20

to prove that parties intentionally entered into a binding surrogacy agreement, here there was something more.  For seven years, the parties' conduct was consistent with the terms of the oral agreement.

III

*The Agreement Does Not Lack a Lawful Object*

Miles argues she is conclusively E.'s mother under section 7610, and that even a *written* traditional surrogacy agreement, without further legal action to terminate her parental rights such as through adoption proceedings, may be insufficient to support a finding that she is not E.'s legal parent.

A.  <u>Section</u> <u>7610</u> <u>Does</u> <u>Not</u> <u>Mandate</u> <u>a</u> <u>Finding</u> <u>that</u> <u>Miles</u> <u>is</u> <u>the</u> <u>Child's</u> <u>Mother</u>

Section 7610, subdivision (a), states that the parent and child relationship between a child and its natural parent, "may be established by proof of having given birth to the child, or under" the UPA.  Miles argues that because she gave birth to E., her parentage is "established" and not "presumed," and her parentage cannot be rebutted.  She argues that, as a result, the only way Gerstein could have secured status as the sole parent of E. was to go through the adoption process or move to terminate Miles's parentage.

But the statute says parentage, "*may be established by proof* of having given birth."  (§ 7610, subd. (a), italics added.)  It does not say parentage, "*shall be established if there is proof* of having given birth."  "Courts routinely construe the word 'may' as permissive and words like 'shall' or 'must' as mandatory.  (See *Compton College Federation of Teachers v. Compton Community College Dist.* (1982) 132 Cal.App.3d 704, 711 [] (*Compton Teachers*); *People v. Durbin* (1963) 218 Cal.App.2d 846, 849 []; see also Gov. Code, § 14 [' "Shall" is mandatory and "may" is permissive'].)  ' " 'While [the] word "may" is sometimes construed as equivalent to "must" in statutory construction, such interpretation is proper only where [the] sense of [the] entire enactment requires it or it is necessary to carry out legislative intention.' " [Citations.]'

21

(*Compton Teachers*, *supra*, at p. 712.)" (*Jones v. Catholic Healthcare West* (2007) 147 Cal.App.4th 300, 307.)

While not directly on point, *Buzzanca* is helpful in demonstrating the word "may" in section 7610 is not used to express something mandatory in all cases.

In *Buzzanca*, the court considered a regretting intended father's argument that section 7610 dictated that the gestational surrogate—as opposed to his erstwhile wife who was the intended mother in the surrogacy agreement—was the legal mother of a child conceived using a separate egg donor. (*Buzzanca*, *supra*, 61 Cal.App.4th at p. 1415.) In rejecting the intended father's argument that the only way to establish maternity was though genetics or giving birth, the court stressed that the statute uses the word "may," instead of "shall." (*Ibid.*)

Here, the trial court found that the parties entered an oral surrogacy contract before conception, under the terms of that contract Miles did *not* intend to raise the child as her own, and her actions post-birth were consistent with that intention. We agree with that finding.

### B. Caselaw Does Not Prohibit the Agreement

There is a dearth of California case law addressing either (1) the enforceability of traditional surrogacy agreements made with single genetic fathers; or (2) the ability of a surrogate to challenge a traditional surrogacy agreement after the parties have operated under that agreement for many years. Citing *In re Marriage of Moschetta* (1994) 25 Cal.App.4th 1218 (*Moschetta*), and its treatment of *Johnson v. Calvert* (1993) 5 Cal.4th 84 (*Johnson*), Miles unpersuasively argues that even a written traditional surrogacy agreement, without further legal action to terminate her parental rights such as through adoption proceedings, is not enforceable here.

In *Johnson*, the relationship between a married couple and their gestational surrogate deteriorated while the surrogate was pregnant, and the couple and the surrogate

filed actions to determine who the mother of the child would be. (*Johnson*, *supra*, 5 Cal.4th at pp. 87-88.) The embryo the surrogate gestated was created using the sperm and ova of the married couple. (*Id.* at p. 87.) As part of the parties' surrogacy agreement, the surrogate agreed she would relinquish all rights to the child born because of the agreement. (*Ibid.*) Our Supreme Court determined the married couple were the natural parents of the child, and that this result did not offend the state of federal constitution or public policy. (*Ibid.*)

The Court began its analysis by looking to the UPA for guidance. (*Johnson*, *supra*, 5 Cal.4th at p. 88, et seq.) The court noted that the UPA as passed in 1975 was not "motivated by the need to resolve surrogacy disputes," but, taking the position that the UPA, "facially applies to any parentage determination, including the rare case in which a child's maternity is in issue," it proceeded to look to the UPA to determine which of the competing potential mothers would qualify as a mother under the UPA. (*Ibid.*) The court then observed that under the UPA's framework, both the surrogate and the wife produced undisputed evidence of a mother and child relationship as contemplated by the act: the surrogate by virtue of having given birth, and the wife by virtue of being genetically related to the child. (*Id.* at p. 92.)

Having found "two women each have presented acceptable proof of maternity," the Court stated, "we do not believe this case can be decided without enquiring into the parties' intentions as manifested in the surrogacy agreement." (*Johnson*, *supra*, 5 Cal.4th at p. 93.) The Court concluded, "although the [UPA] recognizes both genetic consanguinity and giving birth as means of establishing a mother and child relationship, when the two means do not coincide in one woman, she who intended to procreate the child—that is, she who intended to bring about the birth of a child that she intended to raise as her own—is the natural mother under California law." (*Ibid.*, fn. omitted.)

In honoring the intentions of the parties, the court explained it was the married couple who, "affirmatively intended the birth of the child, and took the steps necessary to

23

effect in vitro fertilization.  But for their acted-on intention, the child would not exist.
[The surrogate] agreed to facilitate the procreation of [the married couple's] child.  The
parties' aim was to bring [the couple's] child into the world, not for [the couple] to donate
a zygote to [the surrogate].  [The wife] from the outset intended to be the child's mother.
Although the gestative function [the surrogate] performed was necessary to bring about
the child's birth, it is safe to say that [the surrogate] would not have been given the
opportunity to gestate or deliver the child had she, prior to implantation of the zygote,
manifested her own intent to be the child's mother.  No reason appears why [the
surrogate's] later change of heart should vitiate the determination that [the wife] is the
child's natural mother." (*Johnson*, *supra*, 5 Cal.4th at p. 93.)  As discussed in more detail
in section IV.A. below, the *Johnson* court expressed that honoring the intentions of the
parties as expressed in the surrogacy agreement was sound policy.  (See *id.* at pp. 94-96.)

In *Moschetta*, *supra*, 25 Cal.App.4th at page 1223, a married couple entered into a
traditional surrogacy agreement in which the surrogate "promised to sign all necessary
papers to terminate her parental rights and" assist the wife of the intended and biological
father in adopting the child.  Within months of the child's birth, the father and his wife
separated, eventually divorcing.  (*Ibid.*)  The surrogate joined the dissolution action.
(*Ibid.*)  At trial all parties took the position that the surrogacy contract was unenforceable.
(*Id.* at p. 1224.)  The trial court determined the father and the surrogate were the legal
parents of the child, and the father appealed.  (*Ibid.*)  The father's ex-wife, "did *not*
initiate adoption proceedings and . . . filed a brief in [the court of appeal] *supporting* the
judgment." (*Ibid.*)  On appeal, the father argued the surrogacy contract should be
enforced to preclude the surrogate from being the mother of the child.  (*Id.* at p. 1227.)
The court of appeal disagreed and affirmed the judgment declaring the surrogate to be the
legal mother of the child.  (*Id.* at p. 1229.)

In considering the enforceability of the parties' surrogacy agreement, the
*Moschetta* court began with a discussion of *Johnson*.  The court noted that the *Johnson*

24

decision did not consider traditional surrogacy agreements, and it did not "actually hold that the gestational surrogacy contract at issue . . . was enforceable as such." (*Moschetta*, *supra*, 25 Cal.App.4th at p. 1230.) "Rather," *Moschetta* states, "the [*Johnson*] court stated that such a contract is a proper basis on which to *ascertain the intent* of the parties because it does not offend public policy 'on its face.' (See 5 Cal.4th at p. 95.) In *Johnson v. Calvert* the function of the surrogacy contract was to serve as a vessel in which the parties could manifest or express their intention. (*Id.* at p. 93.) The gestational surrogacy contract was never held to be enforceable per se." (*Moschetta*, at p. 1230.)

The *Moschetta* decision also emphasized that the *Johnson* Court found that the gestational contract at issue was, "properly analyzed in terms of parentage as it is determined under the [UPA]," and the tie-breaking role of intent came into play once the Court determined both the surrogate and the intended mother could establish parentage under the act. (*Id.* at pp. 1230-1231.) The *Moschetta* court concluded that if it applied the *Johnson* framework to the case before it, it could resolve the dispute as to who was the child's mother by applying the UPA alone, because the genetic and birth mother of the child was the same person. (*Id.* at p. 1231.) Thus, the court did not proceed to the next step of determining the intention of the parties as manifested by the surrogacy agreement. (*Ibid.*) The court also observed that the surrogate never consented to an adoption in the presence of a social worker as required by adoption statutes, and, thus the surrogacy agreement could not serve as an adoption agreement. (*Ibid.*)

Approximately four years after it issued the *Moschetta* decision, the same court— in a decision authored by the same justice with a concurring panel including one of the same justices that concurred in *Moschetta*—decided *Buzzanca.* (*Buzzanca*, *supra*, 61 Cal.App.4th at pp. 1412 & 1430; see also *Moschetta*, *supra*, 25 Cal.App.4th at pp. 1221 & 1236.) The *Buzzanca* court stated that section 7610, subdivision (a), does not dictate that a mother and child relationship can only be established by giving birth or genetics. (*Buzzanca*, at p. 1415.) The court then relied on another section of the UPA,

section 7613, to conclude *both* the husband and wife were the child's legal parents. (See *id.* at pp. 1421 & 1426.) Section 7613 said a man who consents to his wife being artificially inseminated with another man's sperm will be treated as the natural father of the resulting child.

The *Buzzanca* court took pains to distinguish the issue before it with the issues raised in *Moschetta*. (*Buzzanca*, *supra*, 61 Cal.App.4th at p. 1423.) It wrote, "*Moschetta* is inapposite because this court never had occasion to consider or discuss whether the original intended mother's participation in the surrogacy arrangement, which brought about the child's birth, might have formed the basis for holding her responsible as a parent. She had given up her claim; the issue was not before the court. Unlike the *Johnson* case there was no tie to break between two women both of whom could be held to be mothers under the Act. (See 25 Cal.App.4th at p. 1224. ['There is no "tie" to break'].) When courts do not consider propositions, their subsequent decisions are not precedent for them." (*Buzzanca*, at p. 1422.) The *Buzzanca* court also noted that, "*Moschetta* is distinguishable because it involved the claim of a woman who both gave birth to the child, 'contributed' the egg, *and who wanted the child enough to go to court to seek custody.*" (*Ibid.*, italics added.) In finding the intended parents were the child's legal parents in *Buzzanca*, the court also wrote: "[t]here is a difference between a court's enforcing a surrogacy agreement and making a legal determination based on the intent *expressed in* a surrogacy agreement. [Citation.] By the same token, there is also an important distinction between enforcing a surrogacy contract and making a legal determination based on the fact that the contract itself *sets in motion* a medical procedure which results in the birth of a child. [¶] In the case before us, we are not concerned, as [father] would have us believe, with a question of the enforceability of the oral and written surrogacy contracts into which he entered with [erstwhile wife]. This case is not about 'transferring' parenthood pursuant to those agreements. We are, rather, concerned

26

with the consequences of those agreements as acts which *caused the birth* of a child." (*Id.* at pp. 1422-1423.)

The case before us also considers facts that are markedly different than those in *Moschetta*. Here the trial court concluded the parties always intended that the child would have only one parent, and they acted in accordance with that intention for many years before Miles sought to assert parental rights. In *Moschetta*, the parties had originally intended that the husband and wife would raise the child together after the wife adopted the child. By the time the case reached the Court of Appeals the wife had decided not to pursue the anticipated adoption and the couple were in the process of divorcing. The surrogate acted to assert a claim to the child under the UPA once she recognized the party was divorcing. That is, in *Moschetta*, the surrogate brought an action while the child was still an infant and when she realized the plan the parties had intended when they entered the agreement would not occur. Here, the parties did not include a provision that Gerstein would adopt E. as part of the agreement or otherwise suggest that the agreement would effectuate an adoption. The agreement did not anticipate a "transfer" of parenthood to a person who had no claim to parentage under the UPA and who would need to resort to adoption to become a parent. (See *Buzzanca, supra,* 61 Cal.App.4th at p. 1425 ["Parents are not screened for the procreation of their own children; they are screened for the adoption of other people's children"].) Instead the parties intended that Miles would never assume the role of parent in the child's life and Gerstein would be a single parent. And the parties lived according to the terms of this agreement, without challenge, for many years after the child's birth. Collectively, *Johnson*, *Moschetta*, and *Buzzanca* do not compel a finding that traditional surrogacy contracts in which the surrogate agrees it will not be a parent to the resulting child are never enforceable.

Other cases in which courts have refused to enforce agreements depriving a person of parentage as recognized under the UPA do not convince us the parties' agreement did

27

not lawfully govern their relationship here. Those cases typically consider two categories of agreements: those where the purported agreement regarding the child's relationship to the alleged parent did not match the practice of the parties once the child was born, and those where the effort to terminate parentage was made after parentage had already been established by a court. Here, the parties' practices matched the purported agreement and Miles's parentage was never legally established.

In *K.M. v. E.G.*, our Supreme Court held that a written waiver of parental rights on the part of a woman who donated her ova to her partner in advance of implantation of embryos *did not* affect determination of parentage under the UPA and it found the woman was a parent to the child. (*K.M. v. E.G.* (2005) 37 Cal.4th 130, 134, 144.) Key to the Court's decision was evidence that, despite the written waiver, the partner who donated her ova and the partner who gestated the child planned to raise and started raising the resulting child together. (*Ibid.*) The Court held, "[a] woman who supplies ova to be used to impregnate her lesbian partner, *with the understanding that the resulting child will be raised in their joint home*, cannot waive her responsibility to support that child. Nor can such a purported waiver effectively cause that woman to relinquish her parental rights." (*Ibid.*, italics added.)

In *People v. Sorensen* (1968) 68 Cal.2d 280, 282, a wife, with the consent of her husband, conceived a child through artificial insemination. The husband was identified as the father on the child's birth certificate, and the couple and child lived as a family for four years. (*Ibid.*) When the parties divorced, the mother wanted no support from the father and moved. (*Ibid.*) Later, when the mother needed public assistance for a time, the People brought an action against the father, he was found guilty of failing to support his child, and he was placed on probation subject to the condition that he pay support. (*Id.* at pp. 282-283.)

In finding the mother and father's post-birth agreement did not relieve the father of his duties, the court wrote, "a reasonable man who, because of his inability to procreate,

28

actively participates and consents to his wife's artificial insemination in the hope that a child will be produced whom they will treat as their own, knows that such behavior carries with it the legal responsibilities of fatherhood and criminal responsibility for nonsupport. One who consents to the production of a child cannot create a temporary relation to be assumed and disclaimed at will, but the arrangement must be of such character as to impose an obligation of supporting those for whose existence he is directly responsible. As noted by the trial court, it is safe to assume that without defendant's active participation and consent the child would not have been procreated." (*People v. Sorensen, supra,* 68 Cal.2d at p. 285.)

In *Kristine M. v. David P.* (2006) 135 Cal.App.4th 783, 787 (*Kristine M.*), a mother filed a petition to establish paternity of her child and the trial court found the alleged father was the child's father pursuant to testing. The trial court then accepted a stipulation between the mother and father that provided the father would pay the mother a lump sum to cover child support arrears and terminated the father's parental rights and child support obligations going forward. (*Ibid.*) Counsel for the child appealed. (*Id.* at p. 788.) The court of appeal reversed. (*Id.* at p. 792.) In so doing, the court noted, "the profound differences between preconception and postbirth agreements. Where, as in *Johnson*[*, supra,*] 5 Cal.4th 84 [], the court honored a preconception agreement, it did so in recognition that without the deliberative, acted-on intention of the couple who sought reproductive assistance, no child would have been born. (*Id.* at p. 93 . . . .) . . . However, where, as here, procreation occurs through normal sexual reproduction, a decision regarding parenthood made *after* the child's birth is one of an entirely different character. The parties in this case freely engaged in an act which resulted in the conception and birth of [the child]. [The father] is held responsible for the consequences of that act because the court has found him to be [the child's] father '[p]er [p]aternity testing,' not because of some preconception intention which, in light of human nature, would play an inherently more ambiguous role than in the case of assisted reproduction.

29

Notwithstanding such ambiguity, with the status of parent conferred upon [father] by the court in this action under the UPA, the law has deemed him to have intended the natural consequences of his actions. Under these circumstances, the public policies favoring creation of a father-child relationship as a source of emotional and financial support, and declaring the preeminence of a parent's obligation to support his or her minor children, trump any policy that would favor private ordering of parenthood after the birth of a child." (*Kristine M.*, at p. 791.)

Here, before E. was conceived, the parties reached an oral agreement that Miles would act as a surrogate, Miles would not be E.'s mother, and Gerstein would be E.'s sole parent. Their conduct before or after E.'s birth suggests this agreement reflected the parties' intentions and governed their conduct moving forward. Nothing in case law leads us to conclude, under these facts, that the agreement unlawfully foreclosed Miles's opportunity to assert her parentage under the UPA, thus rendering the agreement unenforceable after it went unchallenged for seven years.

IV

*Public Policy or Constitutional Considerations*

A. Public Policy Considerations

Our holding here is supported by public policy considerations.

The *Johnson* Court found its decision to honor the parties' intentions in entering into a surrogacy agreement was supported by the writings of legal commentators. (*Johnson*, *supra*, 5 Cal.4th at pp. 93-97.) The Court quoted favorably Professor Marjorie Shultz's article, *Reproductive Technology and Intent-Based Parenthood: An Opportunity for Gender Neutrality* (1990) Wis. L.Rev. 297 (Shultz). (*Johnson*, *supra*, at p. 94.) The Court wrote, "Professor Shultz observes that recent developments in the field of reproductive technology 'dramatically extend affirmative intentionality. . . . Steps can be taken to bring into being a child who would not otherwise have existed.' (Shultz, *op. cit.*

30

*supra*, p. 309.) 'Within the context of artificial reproductive techniques,' Professor Shultz argues, 'intentions that are voluntarily chosen, deliberate, express and bargained- for ought presumptively to determine legal parenthood.' (*Id.*, at p. 323, fn. omitted.)" (*Johnson*, at p. 94.) The Court also noted Professor Shultz's observation that, "the interests of children, particularly at the outset of their lives, are '[un]likely to run contrary to those of adults who choose to bring them into being.' (Shultz, *op. cit. supra*, at p. 397.) Thus, '[h]onoring the plans and expectations of adults who will be responsible for a child's welfare is likely to correlate significantly with positive outcomes for parents and children alike.' (*Ibid.*)" (*Johnson*, at p. 94.)

We recognize that various authorities speak to the benefits of two-parent families, particularly because the formation of two-parent families minimizes the likelihood the public will be called upon to pay to support a child. (See, e.g., *Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 123; *People v. Sorensen, supra,* 68 Cal.2d at pp. 282, 285, 287.) However, here there is no current threat that the public will need to support E., and California law has increasingly recognized the ability of persons to establish single parent households. (See § 7613, subd. (b); *C.M. v. M.C.* (2017) 7 Cal.App.5th 1188, 1191-1192 [upholding a trial court determination that the intended father in a gestational surrogacy arrangement was the sole parent of the triplets born because of that agreement]; *R.M. v. T.A.* (2015) 233 Cal.App.4th 760, 775 ["case authority reflects that judicial application of the section 7611(d) parentage presumption and the two-parent policy does not seek to impose a two-parent choice to the detriment of a single-parent choice, but rather seeks to further a two-parent familial arrangement that has already been developed in the parenting of the child"].) Here, the trial court concluded it would not, in fact, be in E.'s best interests to disrupt the status of her single-parent family.

B.  Constitutional Considerations

Miles and amici curiae make various arguments that the trial court's decision violated Miles's constitutional rights.

First, Miles argues that the trial court order violated her fundamental right to parent.  But from conception until E. was approximately seven years old, Miles never assumed the role of a parent to E.  Indeed, the testimony of numerous witnesses suggests she disclaimed any interest in acting as a parent to E., and she herself testified that she did not plan to and did not (1) financially support E.; (2) make any sort of decisions regarding, or participate in, E.'s education; or (3) provide *any* overnight care of E.  Simply put, as Gerstein testified, at the time the agreement was made, Miles made it plain that she did not want to be a "mom" to another child.  She acted in accordance with that desire for the seven years following E.'s birth.  The trial court's decision does not disturb Miles's parental relationship with E., because Miles did not want to be E.'s parent and never assumed the role of a parent in E.'s life.  In this context, Miles's rights were not violated.  (See *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 838 ["The biological connection between father and child is unique and worthy of constitutional protection if the father grasps the opportunity to develop that biological connection into a full, and enduring relationship"].)

Similarly, in their brief, amici curiae—without appropriately flagging their constitutional law claims with an appropriate heading—makes a passing argument that terminating "protected parental rights" based on a "mere alleged oral agreement, without any meaningful substantive or procedural protections would violate parents' state and federal constitutional rights to both substantive and procedural due process."  (See Cal. Rules of Court, rule 8.204(a)(1)(B).)  But, again, this argument assumes Miles had a fundamental right to parent E.  She did not.  Moreover, the trial court did not make its decision based on a "mere alleged oral agreement."  It conducted a trial at which Miles

32

had ample opportunity to cross-examine witnesses who testified there was an oral agreement, and the opportunity to present her own evidence of the terms of the agreement or that there simply was no oral surrogacy agreement. Miles had no state or federal constitutional right to be a parent under these circumstances.

Finally, amici curiae argue allowing an oral agreement to stand here would violate equal protection principles because, as they interpret it, sections 7960 and 7962 would "irrationally" require greater safeguards be used to create an enforceable gestational surrogacy than a traditional one. This is unpersuasive. We do not read 7960 and 7962 to require *all* gestational surrogacies can proceed only if they are performed under agreements that meet the requirements of section 7962. Rather, the requirements apply in cases where the parties wish to take advantage of the pre-birth filings and presumptively valid agreements the statute provides. (§ 7962, subds. (e) & (i).)

## DISPOSITION

The judgment is affirmed. Pursuant to California Rules of Court, rule 8.278(a)(2) Miles shall pay Gerstein's costs on appeal.

 

 

_____

HULL, Acting P. J.

We concur:

 

_____

MAURO, J.

 

_____

BOULWARE EURIE, J.

33